404 So.2d 557 (1981)
J.D. GAINES
v.
STATE of Mississippi.
No. 52607.
Supreme Court of Mississippi.
October 14, 1981.
*558 Vance & Perrier, Travis T. Vance, Jr., Eugene A. Perrier, W.M. Conerly, Vicksburg, for appellant.
Bill Allain, Atty. Gen. by Mark A. Chinn, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, C.J., and SUGG and LEE, JJ.
SUGG, Justice, for the Court:
Appellant, J.D. Gaines, was indicted, tried, and convicted in the Circuit Court of Warren County for the crime of capital murder. He was sentenced to serve a term of life imprisonment as a habitual criminal under section 99-19-81 Mississippi Code Annotated (Supp. 1977). From this conviction and sentence, he appeals. We affirm.
On October 21, 1978, shortly after 7:00 o'clock a.m., James McIntyre went into the Pack 'N Pay convenience store, and as he did so, a black man passed him who was leaving the store. He stated that there was a light blue late model GM automobile parked in front of the convenience store. About 7:15 a.m. Johnnie Ball and Phylis Morson arrived at the store to find that the clerk was not present. The cash register was closed, the clerk's purse was still there, it appeared that no struggle had ensued, and the safe was closed as well. Ball felt the hood of a blue Toyota, later identified as the victim's automobile, and it was still warm. At approximately 7:20 a.m., the owner of the convenience store, Danny Cappaert, was contacted at his home. He arrived at 7:30 a.m. to find that the victim's car was there but not the victim. Phil Solomon, Vicksburg Chief of Detectives, and other law enforcement officers were then summoned to the convenience store. He stated that it appeared that no struggle had occurred, and nothing was taken from the store.
Harold Hollingsworth left his home about 8:00 o'clock a.m., the morning of October 21, 1978, driving east on Freetown Road. At the point where the blacktop ended and the road forked, he took a right and drove a couple of miles. While driving up an incline, he noticed some clothing in the middle of the road. A short distance from where the clothes were lying, a logging road *559 turned off to the right. Approximately 40 yards down the road he noticed what appeared to be a body, whereupon he contacted Deputy Sheriff Dennis Cahill, and the two of them returned to the location of the body. There, Deputy Cahill found that the victim had been stripped of her clothing and that no signs of life were evident. At this point he cordoned off the road leading to the body and also the area in which the clothes were found. Furthermore, he stated that the body was medium warm when he arrived at the scene, and that there was blood on the back of the head. Detective Solomon, while enroute to the area, called the State Crime Lab to have experts report to the scene. Pictures of the body were taken and introduced into evidence at the trial. Following the autopsy Dr. Leo Scanlon handed the bullet removed from the head of the victim to Detective Solomon. These bullet fragments were introduced at trial.
Earlier that same morning Marvin Summers also saw the clothes in the middle of the road, and 200 yards later, saw a black man talking to a black girl in a late model blue automobile parked by the side of the road. Summers picked the defendant out of a lineup, and identified him as the black man he had seen.
Dr. Leo Scanlon, who had performed the autopsy, stated the cause of death was a gunshot wound to the left side of the head with massive destruction and hemorrhage of the brain tissues. The skin on her elbows was also scraped off, as if she had been pushed down, and there was an extremely severe injury to the vaginal area, though there was no evidence of sexual abuse. At trial, he identified the bullet as the one he had removed from the victim's head. He also stated that, at the time of the autopsy, she had been dead from four and one-half to seven hours.
On May 14, 1979, Sheriff Paul Barrett received a call from Eddie Lucas, Director at Parchman Penitentiary, with regard to certain information that the defendant, J.D. Gaines, thought might prove helpful to the sheriff in solving the case. The defendant had been incarcerated at the Warren County jail on a charge of armed robbery and had heard the sheriff promise to help anyone who could supply him with information related to the murder. An initial statement, implicating several individuals, was taken at Parchman. It was subsequently introduced into evidence at trial. A second statement was also introduced into evidence. Gaines accused nine persons of the murder.
While implicating other individuals, the defendant, Gaines, supplied exact escape routes for the murderers. He accurately described the logging road where the body was located, and he also described the position of the body when it was found. Furthermore, he stated that the victim was carried from the car to the place where she was killed, which would coincide with the fact that none of her footprints were found leading up to the location of the body. Furthermore, a prisoner in the county jail, Shelby Smith, who was serving time for armed robbery, stated that he had overheard a conversation between Gaines and Joe Dawson in which Gaines stated that he and his brothers had gone to the convenience store, had an argument with a lady clerk, abducted her, beat her, and took her jewelry.
Following the defendant's return from Parchman, but preceding his arrest, the murder weapon was recovered. Acting on information supplied by the defendant, the sheriff, two deputies, along with the appellant, went to Gaines' mother's home to retrieve the weapon. Gaines claimed that he had acquired the pistol from Sammy Guajardo on October 22, 1978, the day following the murder. Guajardo stated, on the other hand, that Gaines had taken the gun away from him as the result of a fight over a drug transaction, at the end of the first week of October. Conflicting testimony was presented at trial with regard to the date of the pistol's acquisition.
In establishing an alibi defense, the defendant's two sisters testified that they had visited his apartment the morning of the murder, and that even though he had not *560 responded to their knocking on the door, they knew that he was there. When they returned later in the morning his response to them was, "What do you all want this time." He then told them that his girlfriend had just left the apartment. Gaines' girlfriend testified that she had spent the Friday night before the murder with the defendant, and had not left him until 9:30 or 10:00 o'clock the next morning.
Cindy Bennett, an inmate at Parchman, was called as a defense witness. She testified she was living in a trailer with her boyfriend, Fabregas, at the time of the murder. Fabregas was one of those originally implicated by Gaines in the murder, Don Hester and his girlfriend also lived in the trailer. She went to the Beechwood Lounge on the night of October 20, 1978, where she saw Hester dancing with a woman identified to her as the murder victim. The witness, Fabregas, Hester, and his girlfriend, returned to their trailer at approximately 12:30 a.m. At about 5:30 a.m., Fabregas got up, said he had to take Hester to work, and took a gun with him. Both men returned about 8:30 or 9:00 o'clock a.m., and appeared to be upset. Hester's jacket was torn, and something red had been splashed on his T-shirt.
Gaines did not testify and does not question the sufficiency of the evidence to support the verdict of the jury.
Appellant claims that his Sixth and Fourteenth Amendment rights were violated when the prosecution exercised its peremptory challenges on only the black members of the jury venire. Furthermore, the defendant argues that, in the wake of such action, the trial court erred in not quashing the petit jury.
The United States Supreme Court dealt with this issue in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).
We cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws. In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause. To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the Equal Protection Clause would entail a radical change in the nature and operation of the challenge. The challenge, pro tanto, would no longer be peremptory, each and every challenge being open to examination, either at the time of the challenge or at a hearing afterwards. The prosecutor's judgment underlying each challenge would be subject to scrutiny for reasonableness and sincerity. And a great many uses of the challenge would be banned.
In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it. Hence the motion to strike the trial jury was properly denied in this case. (380 U.S. at 221-222, 85 S.Ct. at 837, 13 L.Ed.2d at 773)
For the reasons stated in Swain, the motion to quash the jury was properly denied.
Appellant also contends that he was a suspect in the case from the time he first contacted the sheriff claiming to have information which would lead to the murderer. As such, he argues that his statements were the result of "custodial interrogation," and that he should have been issued a Miranda warning prior to his questioning.
The crucial question to be asked and answered is whether the defendant was a *561 suspect from the very beginning of his involvement in the investigation, including the period of time in which he gave two statements to law enforcement officers. If he was, the answer is simple. Both Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968) would require that a Miranda warning be given a suspect, even though he is already incarcerated for an unrelated crime.
We hold that he was not a suspect. Testimony was given outside the presence of the jury to establish the voluntariness of Gaines' statements. The sheriff, his deputies, and his secretary stated that the defendant was not a suspect until it had been ascertained that he had been in possession of the pistol used in the murder. Gaines' possession of the murder weapon was not discovered until after he gave his statements. Furthermore, the sheriff followed every lead provided by Gaines in his statements, and all proved fruitless. In short, the accusation was directed toward Gaines only after every other suspect had been thoroughly investigated.
The Court stated in Smith v. State, 229 So.2d 551, 555 (Miss. 1969),
It is, of course, not necessary for an officer to warn every person he talks to about a crime of his constitutional rights... . (However) when it becomes apparent to the investigative officer, or should be apparent from the circumstances, that the person being interrogated is likely to be charged with a crime, the officer must promptly warn him of his rights so that such person will not be required to give information that may incriminate him.
In Edwards v. Arizona, ___ U.S. ___, ___, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 387 (1981), the United States Supreme Court considered this issue. Although it was concluded that the fruits of the interrogation could not be used against Edwards because he had requested an attorney, the Court observed,
Had Edwards initiated the meeting on January 20, nothing in the 5th and 14th Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at trial. The 5th Amendment right identified in Miranda is the right to have counsel present at any custodial interrogation. Absent such interrogation, there would have been no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver.
The defendant was not a suspect at the time the statements were given, and the statements themselves were given only after Gaines had contacted the sheriff claiming to have information regarding the murder. Therefore, the trial judge did not err in allowing the statements to be introduced into evidence.
Similarly, Gaines urges that the voluntariness of his statements was tainted by the sheriff's promises to help those prisoners who might aid him in the investigation. First, the promise was made to all inmates at the Warren County jail, and not to the defendant in particular. Second, the fact that Gaines was not a suspect renders his statements nothing more than voluntary information. Suffice it to say, no law exists precluding rewards for information.
Appellant contends that reversible error was committed in allowing the sheriff, the prosecution's chief witness, to remain inside the courtroom during the majority of the trial even though the rule of sequestration had been invoked.
This Court has held that a case will not be reversed because of the ruling of the trial judge on such question unless it manifestly appears that there has been an abuse of discretion... . The sheriff or his deputies are required to attend all sessions of the circuit court, ... and it is obvious that the trial judge may at times require the presence of the sheriff in the courtroom during the trial of cases in which he may be a witness. Since the sheriff is an officer of the court, this *562 ruling of the court in this regard is necessarily discretionary. [Fondren v. State, 253 Miss. 241, 262, 175 So.2d 628, 637 (1965)]
In order to cast no shadow of impropriety upon his actions, the sheriff removed himself from the courtroom during the testimony of certain witnesses, including Samuel Guajardo, the defendant, and every witness who testified during the motion to suppress two statements given by the appellant at an earlier date.
The trial judge did not abuse his discretion in permitting the sheriff to remain in the courtroom although witnesses had been sequestered. The sheriff voluntarily removed himself during the testimony of those witnesses whose testimony he might be called to rebut or whose testimony might be used to bolster or fortify his own.
The defendant also argues that the sheriff tampered with a defense witness, William Garvin. A separate hearing was held on defendant's motion for a mistrial based on the sheriff's alleged improper conduct toward Garvin.
One of the factual issues in the case was, when did the defendant acquire the murder weapon? On this issue Guajardo, a migrant farm worker, who had taken a crew of workers to the Delta during the month of October, 1978, testified that he purchased a pistol on Saturday of the first weekend of October, which was October 7. The next day, Sunday, October 8, Guajardo got into a fight with defendant at which time defendant took the pistol from Guajardo. This testimony was significant because it placed the murder weapon in the hands of defendant two weeks before the murder on Saturday, October 21. One of the main points of dispute that arose with regard to Guajardo's testimony involved his statement that he had traveled to Indianola in his red pickup truck, along with two other persons, to purchase the pistol in question. Guarjardo remembered that he had purchased the pistol on October 7 before he bought a new white pickup truck on October 17, 1979. His testimony as to the date of the purchase of the truck was corroborated by a bill of sale for the white truck which showed that it was purchased on October 17, 1978.
At the conclusion of Guajardo's testimony, the court released him from his subpoena and allowed him to return with his family to their home in San Antonio, Texas. Before Guajardo finished testifying, the defense had him identify William Garvin who was one of the persons who had accompanied Guajardo to Indianola to buy the pistol.
At the hearing on the motion, outside the presence of the jury, the district attorney stated that he asked defense counsel the purpose of having Guajardo identify Garvin and the response was that the gun was purchased at a different time. He asked the defense attorney when the gun was purchased but received no response. He then suggested to the sheriff that he have someone contact Garvin and find out what he was going to testify to. At the hearing on the motion, the sheriff testified that after Garvin left the courtroom the district attorney asked him to locate Garvin and ascertain whether the state would need his testimony. The sheriff dispatched his deputies to locate Garvin and in the meantime called the sheriff of Humphreys County to find out if he knew Garvin. The Humphreys County Sheriff responded that he had talked to Garvin and that Garvin had told him that he (Garvin) and Guajardo had traveled to Indianola in a white pickup truck, not a red truck.
Garvin was located and a meeting was held, at which the sheriff, Guajardo, Garvin and two deputy sheriffs were present. The sheriff testified that Garvin said he and Guajardo had bought the gun while they were both working at the cotton gin. Guajardo then told the sheriff that he had left his work at the gin on Saturday, October 21, 1978. Garvin said he quit work at the gin two weeks before Guajardo had quit. Garvin told the sheriff that they had traveled to Indianola in the white truck. The sheriff said he had not heard Guajardo's testimony but he had a bill of sale for the white truck which indicated that it was purchased on October 17. Noting the discrepancy *563 in Garvin's story that was posed by the bill of sale, the sheriff said to Garvin that it couldn't have been the white truck because Guajardo had purchased it after the time Garvin said he had quit work at the gin.
The sheriff said that he met with Garvin for the purpose of trying to find out what Garvin's testimony would be and his purpose in questioning Garvin was to clear up the conflict over the color of the truck. He said he had not attempted to influence the testimony of Garvin and his testimony was corroborated by the two deputies.
Garvin testified that Guajardo and the sheriff had told him that it was a red truck and that under this pressure he decided to go along with them. Garvin said when the deputy sheriff told him the sheriff wanted to talk to him he thought he had to go but that he did not tell the deputy that he did not want to talk to the sheriff. He also stated that no one attempted to keep him from appearing in court and he was in court of his own free will.
The court overruled the motion and observed that the exigencies of the situation required prompt action by the prosecution. Guajardo had been released from his subpoena and was in the process of leaving the state when Garvin was contacted. It was the duty of the sheriff to interview Garvin and determine from that interview whether Garvin, or Guajardo, or both, should be bound by subpoena to testify for the state.
Garvin was not intimidated in any manner whatsoever because he later appeared as a witness for the defendant and testified that he accompanied Guajardo in a white pickup truck to buy the pistol on October 21. Therefore, there was no prejudice to the defendant.
Defendant's last argument is that the trial court did not follow Rule 6.04 of the Uniform Criminal Rules of Circuit Court Practice. The trial judge followed the procedure approved by this Court in Lay v. State, 310 So.2d 908 (Miss. 1975). See also, Spencer v. Texas, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967).
The trial judge read the indictment to the jury, including the previous convictions and did not hold a separate trial on the principal charge in the previous convictions. Appellant argues that such action demands a reversal under Rule 6.04.
The Uniform Criminal Rules were adopted by this Court on August 15, 1979, and the last paragraph of the order provides:
It is therefore ordered and adjudged that the Uniform Criminal Rules of Circuit Court Practice (as amended and modified by this Court), a copy of which amended and modified rules is hereto attached, be and they are hereby approved and adopted by the Supreme Court of Mississippi. The Clerk of this Court will send West Publishing Company a corrected copy of these Criminal Rules for publication in the Southern Reporter (Mississippi Section).
Pursuant to the direction of the Court, a copy of the rules was published by West Publishing Company on October 19, 1979, in the Southern Reporter. This was nine days after the judgment was entered in this case. The order adopting the rules did not fix a date for the rules to take effect, but directed publication in the Southern Reporter. We hold the rules did not take effect until publication in the advance sheet of the Southern Reporter on October 19, 1979.
For the reasons stated, this case is affirmed.
AFFIRMED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and WALKER, BROOM, LEE, BOWLING and HAWKINS, JJ., concur.