548 So.2d 118 (1989)
Phillip STOKES
v.
STATE of Mississippi.
No. 58428.
Supreme Court of Mississippi.
July 19, 1989.
George M. Ward, Natchez, for appellant.
Mike Moore, Atty. Gen. by Leyser Q. Morris, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and ROBERTSON and ANDERSON, JJ.

I.
ROBERTSON, Justice, for the Court:
Today's appellant has been convicted of a brutal robbery/murder for which he has been sentenced to life imprisonment. Issues tendered include admissibility of an inculpatory statement, fruits of a search, and a plethora of evidentiary points. We have examined the record with care and can but conclude that no error of consequence appears. We affirm.

II.
Picnicking on the Natchez Trace Mother's Day, 1986, a Louisiana family found the nude, bound body of an elderly male lying in the now grassy roadway of the old Trace. The police responded to the family's call, came to and secured the scene. The body, not identified but covered with *119 flies and some debris, was bound at the wrists with a plastic covered cable, a white extension cord, and some black and white tape. Brought to the morgue, the body was still not identified throughout the afternoon, until about 9:00 p.m., when the police received notice that a Mrs. William Jackson had reported her husband missing.
That same Sunday Eddie Jackson, the victim's son, aware that his father was missing, spotted his father's car riding down Pine Street in Natchez. The driver parked at the Zipy's Store, which he then entered. Eddie Jackson followed the man inside Zipy's and asked where he got the car, to which the man replied "it's mine, I bought it." Jackson trailed the car for awhile, but eventually lost it.
With an APB out on the car, police quickly found it parked on the corner of Pine and St. Catherine Streets in Natchez. Linda Pendleton, an employee of the Zipy's store who had witnessed the conversation with Eddie Jackson, and Officer Edward Easton of the Natchez Police went undercover into several clubs in the area. In the Pine Street Fish Market Pendleton spotted the suspect shooting stick. Officer Easton followed the suspect outside of the club, where waiting officers stopped him. The suspect had keys sticking out of the waistband of his shorts, and Officer Charles Gibson asked him if he knew anything about the nearby parked car. He pleaded ignorance. Officer Gibson put the suspect's keys into the car's lock, which fit.
Brought down to the stationhouse and charged with murder, Phillip Stokes was searched and then the car. Inside the car was found a .32 caliber revolver, registered to William Jackson, with three live rounds remaining, and a wallet from the front seat's floorboard. Inside the wallet were credit cards bearing the name William Jackson, Jackson's driver's license, pictures of Jackson's family members, an American Legion card, but no money. An officer removed from Stokes' arm a Caravelle wristwatch, later identified by Mrs. Jackson as her husband's. Also removed from inside the car was a blood-stained leather purse. A number of blood-stained items were found in the trunk: a paper file folder, a small ice chest, a bag of screws, the bottom of a cardboard box, and a Church's Fried Chicken bag, among other items. Last, the FBI was able to match a number of fingerprints taken from the car with those of Phillip Stokes.
During the night Stokes gave a statement of his involvement in the crime, the disputed circumstances of which will be discussed below. Meanwhile, the police, at 1:15 am, were sent to the home he shared with his mother, Mrs. Catherine Stokes, on Texas Street in Natchez. Mrs. Stokes signed a consent to search form and the officers searched Phillip's bedroom. There they found a paper bag containing a blue knit shirt, a pair of eyeglasses, a telephone card with William Jackson's name and years of service on it, and several receipts bearing Jackson's name.
On the previous Saturday, Howard and Michael Sherman, Stokes' brother and nephew respectively, both of whom lived near Stokes, entered the Stokes home and observed the nude body of a man lying on the bedroom floor. Michael entered first, then called his father to come see the body. His father testified he saw the nude, bound at the feet, body in Stokes' bedroom. As Howard Sherman was leaving the house Stokes drove up in a car Sherman did not recognize. Sherman asked Stokes about the body, and Stokes replied the man was on drugs. Sherman then heard Stokes say, from his bedroom, "Get up man, get up."
On the afternoon of the 12th, when Officer Lee Ford was dropping Howard and Michael Sherman off at their home, Mrs. Catherine Stokes approached Ford and told him there were items in her house that did not belong to her son, Phillip. Ford said Mrs. Stokes invited him in and showed him things now placed in front of Phillip's bed. The items were an undershirt, undershorts and shoes, all later identified by Mrs. Jackson as her husband's.
On the 13th of March a search warrant was executed upon Mrs. Stokes, and six officers combed the house for evidence. Found were remnants of tape, which were later identified as matching the tape found *120 on Jackson's body, a South Central Bell cap found wedged between the bed and a trunk in the bedroom, a pair of black shorts, later identified as Jackson's, and a piece of blood stained mattress. The officers also removed several pieces of blood stained plank from the rear porch of the Stokes' home. None of the items with blood, including the items found in the car truck, could be excluded as inconsistent with the blood of William Jackson.
An autopsy performed on Jackson revealed that he died from an acute pulmonary edema and cardiac tamponade, caused by pressure around the larynx. The doctor performing the autopsy determined that Jackson showed signs consistent with someone "choked or strangled from the ligature that was around his neck and came up behind each ear." No fragments of metal were found in the body, but a small puncture wound was found in Jackson's left chest. Not the cause of death, it was probably caused by a blunt type metallic instrument with enough force to penetrate the skin and break a rib. In addition Jackson's face showed contusions and minor lacerations, with a bloody discharge coming from both ears.
On July 15, 1986, the Grand Jury of Adams County formally charged Phillip Stokes with capital murder, that is, murder committed while engaged in the commission of a robbery. Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1989). The case was called for trial on July 17, 1986, and four days later Stokes was found guilty as charged. A separate sentencing hearing was held thereafter whereupon Stokes was sentenced to life imprisonment. From this conviction and sentence, Stokes prosecutes the present appeal.

III.
Stokes first argues that the Circuit Court erred when it overruled his objections to the prosecution's presentation of his videotaped statement to the jury. The essence of Stokes' statement is that he agreed to go riding with Jackson that morning, but needed to go to Stokes' house to change his clothes. Once inside the house, he heard Jackson knock on the door, wanting to use the bathroom. Instead, while Stokes was pulling off his shirt, Jackson pulled a pistol on him and placed it to the back of his head, demanding that Stokes undress and lay down on the bed. As Jackson attempted to "force hisself in me" Stokes asked to use the bathroom, as a pretense. When he came out of the bathroom Stokes picked up a hallway telephone, but Jackson slammed it down and unplugged the cord. Back on the bed, Stokes turned around and grabbed him and the two struggled. Stokes got hold of the gun and began shooting. He hit Jackson in the front, but did not see any blood. Jackson continued to move, so Stokes tied him up with the tape. Stokes left the house with his wallet and keys to go call the police, but for some reason turned back, and saw his nephew leaving the house. Stokes told his nephew the man was drunk, then went in and dragged Jackson down the back steps of his house and into his car. All of Stokes' version happened sometime between noon and one o'clock on Saturday afternoon.
There is a sense in which the statement is not technically a confession. If it had been believed, the statement could have formed a predicate for the jury's exonerating Stokes. See Miss. Code Ann. § 97-3-15(1)(e) or (f) (Supp. 1989). On the other hand, the statement was highly incriminating in that it confirmed that Stokes was with Jackson and that Stokes killed Jackson. Moreover, by its departure from the physical evidence and that of the witnesses' in so many respects, the jury quite likely perceived it as a fabrication.
All agree that when Stokes was first brought to the stationhouse just before midnight on May 11, he stated that he did not wish to talk and refused to sign a waiver of his rights. Stokes says at this time he asked for an attorney, but the officers deny this. On the morning of May 12th, around 9:00 a.m., Stokes was brought down from his cell to be questioned by Officer Ferrell of the Adams County Sheriff's Office and Agent Cy Hoaglund of the FBI. This interrogation lasted only a few minutes with Stokes refusing to talk. Both *121 officers testified at the suppression hearing that they did not recall whether Stokes requested an attorney at this point.
Officer John Manley testified at the suppression hearing. He said he participated in an interrogation of Stokes the evening of the 12th, and that Stokes read and signed a waiver form at 10:36 that evening. With Officer Eli Johnson in the room Stokes first gave a verbal statement, which was not recorded, then two video versions, before which he signed another waiver of rights form. This is consistent with Stokes' version. According to Manley the entire interrogation was about two and one half hours, but the parties stipulated later that the final videotaping did not end until 3:06 a.m. on May 13th. Manley testified that at no time did Stokes request an attorney. Officer Johnson, however, said that Stokes did request to see an attorney, but after the video statements were taken.
At the conclusion of the hearing the Circuit Court denied the motion to suppress. Finding that Stokes was allowed to telephone his mother the night of the arrest he was therefore not held incommunicado. See Scarborough v. State, 261 So.2d 475, 479 (Miss. 1972). Stokes' second request for a phone call, which at the hearing Stokes said was to call an attorney, was not clearly expressed to the officers. The Court found that Stokes exercised his right to remain silent on three occasions, and further found that, had he requested an attorney, he would have been so provided. During the evening of May 12th, Stokes was questioned by Officers Eli Johnson and Charles Gibson
both of whom the Court takes judicial knowledge are black officers in the sheriff's department; that he was subsequently interrogated by Officer John Manley, the third officer present during this period. Again defendant was adequately and properly advised of his rights, and at that time the defendant did sign a waiver of the right to have counsel present and an acknowledgment of an understanding of his rights; that he did thereafter give voluntary statements to these officers; that these statements were not obtained by coercion or threats of any kind; and the Court believes they were obtained in accordance with the rules prescribed by the Miranda case and the subsequent rulings of the United States Supreme Court and the rulings of the Mississippi State Supreme Court in this regard. For that reason, defendant's motion to suppress these statements will be denied.
Where a criminal defendant challenges the voluntariness of a confession, he has a due process right to a reliable determination that the confession was in fact voluntarily given. Jackson v. Denno, 378 U.S. 368, 377, 84 S.Ct. 1774, 1781, 12 L.Ed.2d 908, 915 (1964); Lego v. Twomey, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618, 627 (1972); Gavin v. State, 473 So.2d 952, 954 (Miss. 1985). Where the voluntariness of a confession and the waiver of rights necessarily attendant upon such are put in issue, the prosecution has the burden of proving all facts prerequisite to admissibility, including voluntariness, beyond a reasonable doubt. Burnside v. State, 537 So.2d 420, 423-24 (Miss. 1988); Gavin v. State, 473 So.2d at 954; Bell v. State, 274 So.2d 371, 374 (Miss. 1973).
The point is pressed that the Circuit Court misunderstood the prosecution's burden of proof and employed an erroneous legal standard when it overruled Stokes' motion to suppress. There appears in the record a dialogue between the Circuit Court and defense counsel wherein the Court makes clear its understanding that the prosecution has the burden of offering a prima facie case of admissibility which, when rebutted by the defendant, then requires that the prosecution offer all witnesses to the confession. See Agee v. State, 185 So.2d 671, 673 (Miss. 1966) and progeny. Stokes and his counsel seem to be of the impression that the Circuit Court understood "a prima facie case" to mean something other than proof of voluntariness beyond a reasonable doubt. In fact, the Court held a prima facie case to have been made out upon the testimony of three officers, Johnson, Gibson and Manley. Once these officers testified, the ball was *122 tendered to the defense. Suffice it to say that the combined testimony of these three officers established a predicate upon which the Court could only reasonably have held beyond a reasonable doubt that Stokes had been given his full Miranda warnings and that he had freely and voluntarily waived his rights and made his statement. What is controlling is that in the end the Circuit Court held that the prosecution had met its burden of proof and there can be no doubt from the record that the Circuit Court understood the beyond-a-reasonable-doubt burden of proof the prosecution bore.
Stokes asserts that his confession was inadmissible because he requested an attorney and none was made available, officers threatened to pick up and arrest his mother, he was shown autopsy photographs during the interrogation, and an officer suggested he was not telling the truth during the interrogation. The Circuit Court expressly or implicitly resolved all of these factual points against him. Stokes is thus restricted by established limits upon this Court's scope of review. This is essentially a fact-finding function. Neal v. State, 451 So.2d 743, 753 (Miss. 1984). So long as the court applies the correct legal standards, "we will not overturn a finding of fact made by a trial judge unless it be clearly erroneous." See, e.g., Woodward v. State, 533 So.2d 418, 427 (Miss. 1988); Hall v. State, 427 So.2d 957, 960 (Miss. 1983); Ratliff v. State, 317 So.2d 403, 405 (Miss. 1975); cf. Culbreath v. Johnson, 427 So.2d 705, 707-708 (Miss. 1983); Jones v. State, 461 So.2d 686, 697 (Miss. 1984). Where, on conflicting evidence, the court makes such findings, this Court generally must affirm.
In the context of the present record, we have no authority to reverse. The assignment of error is denied.

IV.
Stokes next challenges the Circuit Court's denial of his motion to suppress evidence seized by the prosecution incident to a Consent to Search and a search warrant. Here Stokes asserts that it was error for the court to allow evidence seized from the Stokes' home, principally because Stokes' mother had no right to consent to a search of Stokes' "private bedroom" in the home. Stokes similarly protests a second search, this one pursuant to a search warrant, in part because the warrant should have specified Stokes' bedroom as the area to be searched.
Officer Carroll Ashcraft of the Adams County Sheriff's Department testified that on May 12th he went, along with Deputy Charles Gibson, to 1219-1/2 Texas Street, where Stokes lived with his mother, "to talk to the owner of the residence about checking the home." He said they asked Mrs. Stokes for permission to search the house, that she advised them she paid the rent on it, that Stokes stayed with her, and that he did not pay any rent. A permission to search form was signed by Mrs. Catherine B. Stokes at 1:15 a.m. on May 12th (sic), 1986. Mrs. Stokes testified that Stokes helps out with the "house", that she "just sometimes" goes in and out of Stokes' room, that she keeps her sewing machine in Stokes' room, that Stokes keeps his door locked most of the time, and that both of them "go all over the house."
On the 13th of May Officer Ferrell, Deputy Sheriff of the Adams County Sheriff's Department, requested a search warrant for the premises of 1219-1/2 Texas Street. In it he particularly described the effects of William Jackson, including evidence of the deceased's presence within the house. Sworn before The Honorable John Hudson, the warrant is included in the record. As a result of the two searches the officers found a store of evidence, clothes of the victim, receipts and cards with the victim's name, and bloodstains on the rear floorboards of the porch. All items were introduced into evidence over Stokes' objections.
Consent to search voluntarily given without coercion may be given by a third party who possessed common authority, mutual use and joint control over property not in the exclusive control or possession of the defendant and where the defendant had no reasonable expectation of privacy. Houston v. State, 531 So.2d 598, 602 (Miss. 1988); Shaw v. State, 476 So.2d 22, 24 (Miss. 1985); Hudson v. State, 475 So.2d *123 156, 158 (Miss. 1985); Smith v. State, 465 So.2d 999, 1002 (Miss. 1985); Brown v. State, 358 So.2d 1004, 1005 (Miss. 1978); Haralson v. State, 318 So.2d 891 (Miss. 1975); United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). The consent must be shown to be voluntary and not coerced, by explicit or implicit means, and not a mere acquiescence to the claim of lawful authority. Brown v. State, 358 So.2d at 1005; Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). See also, Smith v. State, 465 So.2d at 1002.
In Brown this court upheld the admission of evidence obtained from a search of a home the defendant shared with his mother where the mother voluntarily gave permission and consent for the search of her residence. A coat, a key piece of evidence, was found in a dirty clothes hamper in the kitchen-laundry room, not in the exclusive domain of the defendant. Brown, 358 So.2d at 1005.
In Cain v. State, 337 So.2d 935 (Miss. 1976) this Court held admissible money found in a pocket of the defendant's suit, which was found hanging in the closet of the defendant's girlfriend, pursuant to her consent to search. Accord, a defendant's brother's consent to search the backyard of the family residence, since there was mutual use of the property by persons generally having joint access or control for most purposes. Loper v. State, 330 So.2d 265 (Miss. 1976).
On this point the Circuit Court ruled
The officers have testified that it was reported to them on or about the 12th of May, 1986, that a nude body had been seen bound and laying on a bed in this house at Daisy Street  is it Daisy Street? ... Texas Street. I've heard the testimony of the officers as to their inquiries of Mrs. Stokes as to the ownership of the property; they secured a permission to search the property from the legal tenant. There is testimony in the record that Phillip Stokes stayed there sometimes; there is testimony that the door to the room was left open on many occasions and in fact had apparently been left open to the observation of those parties who saw the nude body laying on the bed. And I fail to find from any of the testimony before me that Phillip Stokes could have had a reasonable expectation of privacy as to this particular room under all of the circumstances surrounding it, so I will overrule and deny the motion.
To test the sufficiency of a search warrant we apply the totality of the circumstances test set out in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) and adopted by this Court in Lee v. State, 435 So.2d 674 (Miss. 1983). In Lee this Court wrote: "the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the `veracity' and `basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a `substantial basis for... conclud[ing]' that probable cause existed". Carney v. State, 525 So.2d 776, 783 (Miss. 1988), quoting Lee v. State, 435 So.2d at 676.
"Probable cause for issuance of a search warrant is present when facts and circumstance within the officer's knowledge, or of which he had reasonable trustworthy information, are sufficient in themselves to justify a man of average caution in the belief that a crime has been committed and that a particular individual committed it." Hall v. State, 455 So.2d 1303, 1304 (Miss. 1984). The standard for determining if probable cause existed is an objective one. The facts upon which the State relied to establish probable cause must be sufficient to "warrant a man of reasonable caution in the belief that the action taken was appropriate." Carney v. State, 525 So.2d at 783, quoting Terry v. Ohio, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968).
It's the opinion of this court that law officers throughout the United States have the right to go to the scene of a *124 felony crime when it is reported to them that a felony crime has occurred. It is evident to the court from the testimony in this case that these deputy sheriffs have probable cause to believe that a felony crime had occurred in Adams County, Mississippi, some time on Saturday, May the 10th, 1986.
We find no error in the Circuit Court's overruling the motion to suppress and allowing the fruits of the searches to be received into evidence over Stokes' objection.
The assignment of error is denied.

V.
Stokes charges error in procedure at the suppression hearing. His point is that Officer Tommy Ferrell was allowed to testify at the suppression hearing, although he had remained in the court room during the prior testimony of Officers Manley, Johnson and Gibson. Stokes argues that this is a violation of Rule 615, Miss.R.Ev. It does indeed appear that at the outset of the hearing Stokes invoked his rights under Rule 615 that all witnesses should be excluded from the court room so that they could not hear the testimony of other witnesses.
We have held only recently that Rule 615 regarding exclusion of witnesses must be taken seriously. Douglas v. State, 525 So.2d 1312 (Miss. 1988). Without question, the rule is enforceable at a pre-trial suppression hearing. Rule 101 and 1101, Miss. R.Ev.
There is a nugget of language in Gaines v. State, 404 So.2d 557, 562 (Miss. 1981) which is helpful. In affirming that conviction, this Court held the sheriff's rebuttal testimony despite the invocation of the Rule not error because, in part, "The sheriff voluntarily removed himself during the testimony of those witnesses whose testimony he might be called to rebut or whose testimony might be used to bolster or fortify his own." Gaines, 404 So.2d at 562.
Officer Ferrell's testimony in this case, in rebuttal, appears to focus on the general procedure of the Adams County Sheriff concerning informing defendants of their right to an attorney. Here Ferrell testified that his encounter with Stokes, the morning of the 12th, was brief and no information was elicited because Stokes did not want to speak. Stokes was verbally informed of his rights, and no rights form was signed. He further testified that it was the Department's policy to offer a list of attorneys to defendants who so requested. Ferrell testified that he could not recall whether Stokes requested an attorney. Nothing in Ferrell's testimony could reasonably have adversely affected Stokes on any issue pending at the suppression hearing. Under these circumstances, the technical violation of Rule 615, if any, may only be harmless error.
The assignment of error is denied.

VI.
Stokes next complains that the Circuit Court erred when it allowed the prosecution to introduce into evidence photographs of the body of the deceased. During the rebuttal testimony of Officer Stutzman, the prosecution successfully introduced two pictures of the victim Jackson. The pictures are full shots of the victim's face and neck lying on an autopsy table. The defense objected to their introduction as prejudicial, inflammatory and that Stutzman's testimony was sufficient to inform the jury of the condition of Jackson's neck without the pictures. Further, Stokes charged the photos were not accurate depictions of the state of the victim's neck because of dirt and debris that clung to the body.
We are of the view that these photographs, though grisly, were probative of the condition of the body, both as to the cause of death and to rebut Stokes' claim that he shot Jackson in self-defense. No doubt the photographs were relevant on this point and as such admissible. Rules 401, 402, Miss.R.Ev.
Rule 403, Miss.R.Ev., authorizes the Circuit Court to exclude even relevant evidence, if its probative value is substantially outweighed by the danger of unfair prejudice. Darby v. State, 538 So.2d 1168, 1174 *125 (Miss. 1989); Kniep v. State, 525 So.2d 385, 388 (Miss. 1988); Boyd v. State, 523 So.2d 1037, 1040 (Miss. 1988). This rule necessarily vests in the Circuit Court a certain amount of discretion. In view of the argument Stokes had advanced regarding the way in which Jackson met his death, we cannot say that the Circuit Court abused its discretion when it declined to hold the danger of prejudice to outweigh the clear probative value of the photographs.
The assignment of error is denied.

VII.
As the Circuit Court ruled on admissibility of the photographs, the jury heard the following:
THE COURT: Mr. Rosenthal, I'm going to overrule your objection in light of the statement that was admitted into evidence and the nature of this particular case as to cause of injuries. I think these two photographs should be admitted into evidence for the purpose of sustaining the State's position as to the cause of the injury or death. I think they will aid or assist the jury in determining the facts is what I'm saying.
MR. ROSENTHAL: Your Honor, I'm going to move for a mistrial based on your last comment; it constitutes a direct comment upon the evidence.
THE COURT: No, Sir. Well, that's what I'm saying  I'm trying  I want them admitted into evidence for purpose of aiding and assisting the jury in determining this fact, which is a fact they must decide.
MR. ROSENTHAL: That is not the statement that the Court made, Your Honor, and I am again moving for a mistrial because you did comment on the evidence.
THE COURT: All right, Sir, I'll overrule.
On appeal Stokes argues that this statement by the Court was improper, that when the Court makes a comment that affects the weight of the evidence it is error, giving the impression to the jury that the Court thinks the defendant is guilty.
The law "does not place the judge in a straitjacket nor prevent him from having anything to say during the course of a trial. Of course, he should keep off of the province of the jury, and not try to influence their verdict; and while it might be safer for him to rule without giving his reasons therefor, he has the right to give such reasons if he so desires, and to show why, in his opinion, the reasons advanced for a contrary ruling are unsound. In so doing, he may go too far and transgress the proprieties; but such is not the case here... . It is true that an overspeaking judge is no well-tuned cymbal, but ... neither is an aphonic dummy a becoming receptacle for judicial power". Bumpus v. State, 166 Miss. 276, 144 So. 897, 898-899 (1932). The Bumpus case is sufficient unto the day for denial of this assignment of error. See also Haralson v. State, 314 So.2d 722, 724 (Miss. 1975); Sims v. State, 313 So.2d 388, 390 (Miss. 1975); Ladnier v. State, 273 So.2d 169, 173 (Miss. 1973).
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, DAN M. LEE, P.JJ., and PRATHER, SULLIVAN and ANDERSON, JJ., concur.
PITTMAN and BLASS, JJ., not participating.