# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 96-KA-01025-SCT

*LEE FLOYD DANCER, JR.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/06/96 |
| TRIAL JUDGE: | HON. JOHN M. MONTGOMERY |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DONNA SMITH |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 8/20/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/10/98 |

**BEFORE SULLIVAN, P.J., BANKS AND SMITH, JJ.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. This appeal challenges the validity of convictions for armed robbery and murder. After careful review of the circuit court proceedings, we conclude that the court committed no error mandating reversal and affirm the appellant's convictions and sentences accordingly.

## I.

¶2. On April 28, 1995, Charlie's One Stop, a neighborhood grocery store in Columbus, Mississippi, was robbed. The owner of the store, Blanche Welch, suffered multiple stab wounds and died of a fatal wound to the neck and chest. Two days following the murder, officers of the Columbus Police Department were canvassing the neighborhood in hopes of finding suspects. One such officer, Commander Donald Freshour, was walking on 20th Street when he saw an older woman with a group of young boys working on a lawn mower in her yard. Commander Freshour asked the woman if she had any information regarding the murder. She did not know anything. As he was about to leave, Freshour asked the group of boys whether they knew anything about the crime. One of the boys answered yes. He then proceeded to tell the officer that he was riding by the store on his bike when it happened.

¶3. Freshour did not know the boy's name at the time though it was later learned that he was the appellant, Lee Floyd Dancer, Jr. Freshour called Dancer off to the side and asked him was he sure about witnessing the murder. The boy replied, "Yes," and he then told the uniformed officer he saw two white men in a green Malibu with an Alabama license plate drive up in front of the store, shoot through the door, run inside, stab the woman, take potato chips, candy and money, run out, jump in their car and leave the scene. Believing the boy knew something about the murder because his story showed that he had obviously been at the store as there was a very old bullet hole in the door, because he said the woman had been stabbed when that information had not been made public[1] and because he had correctly identified the items that were actually missing from the store, Freshour asked Dancer if he would come to the station and give his information to the investigators. Dancer agreed.

¶4. A uniformed officer came and picked Dancer up. His bike was placed in the back of the patrol car and he sat up front with the officer. He was not handcuffed as he was being taken in as a witness and not a suspect. He was not under arrest at that point. Freshour radioed Sergeant Selvain McQueen at the station and told him that he was sending a potential witness to the murder and that the boy needed to be interviewed. When Dancer arrived, McQueen and David Turner, the other investigator, were speaking with two other individuals they suspected in the crime. They stopped their interrogation of the two suspects and went outside where Officer Gordon was dropping off Dancer. They took his bike out of the car and laid it against the building. Then, Dancer and the investigators went into the station. As they walked down a hallway, one of the investigators asked Dancer what kind of information he had. Dancer again stated that he was present when Welch was *shot*. Knowing the victim had not suffered any gunshots, McQueen told Dancer that they were tired and did not have time for games and asked him to leave. Turner, however, said they might as well interview him since he was there. As such, they took him into an interrogation room.

¶5. Inside the room, Turner sat behind the desk and Dancer sat in a chair close to the door. McQueen laid down on the couch. Turner and Dancer began to talk. Dancer repeated his story about the two white men in the green Malibu. Turner noticed a stain on Dancer's shoes. He asked him if it was blood. Dancer replied, "No." He then said, "I didn't kill that woman. I didn't *stab* her." Again believing the manner of Welch's death was not public information, the officers viewed Dancer as a suspect. As such, Turner read him his waiver of rights form, which Dancer said he understood. After several hours of telling the officers the same story about the white men, Dancer finally confessed to his involvement. This statement was recorded. According to this statement, Dancer was approached by seventeen-year-old Uron Bush who told him that he was going to rob Charlie's. Bush asked Dancer to be a lookout. Dancer "just left." He went to Charlie's One Stop a couple of hours later, but not as part of a plan with Bush. As he was paying for chips and a popsicle, Bush, "O" and a guy from the north side "busted into" the store. Dancer "got scared, jumped up against the wall and just froze." Bush began to stab Mrs. Charlie. The interrogating officer asked Dancer if he "forgot" to be the lookout, Dancer replied, "Naw, I wasn't going to be the look out."

¶6. After taking the money from the register and various items of food, Bush, "O" and the other guy left. Dancer remained in the store for about two minutes after they left. He was crying and almost fainted. He then grabbed his purchase as well as a Butterfinger and cola that he did not pay for and left. Dancer ran to a nearby friend's house. The other guys went to an abandoned flower shop. He

saw Bush at some point later. Dancer told Bush that he (Bush) was going down big time. Bush threatened to kill Dancer if he told anybody what happened. According to Dancer, he fabricated the story about the white men in the green Malibu because "they" would have been after him.

¶7. At the end of the interrogation, Dancer acknowledged that the officers had not threatened or coerced him or promised him anything -- that he was making the statement voluntarily and knowingly.

¶8. The next day the investigators interrogated Dancer again. According to the investigators, they were seeking the names of the other boys previously mentioned. In this statement, Dancer said in pertinent part that:

> [Bush] . . . told me to meet him up at Charlie's One Stop. . . . I met back up with [Bush] near Charlie's One Stop. . . . [Bush] said he was going to rob the lady. . . . [Bush] wanted me to go inside the store and get some chips for him. I was suppose to distract Mrs. Charlie and they were supposed to come in after I was there. I then went inside the store . . . I didn't know that Uron Bush was going to kill the lady at Charlie's One Stop. I used to work for her and she never did anything to me. We went there to rob Mrs. Charlie and we didn't know that it was going to turn out the way it did. . . .

¶9. Following a mistrial due to a hung jury, Dancer was tried and convicted of armed robbery (count I) and murder (count II). The trial court sentenced him to life imprisonment for murder and thirty years imprisonment for the armed robbery, to be served concurrently with the life sentence. Dancer moved for a new trial, which was overruled.

¶10. Aggrieved by his convictions and sentences, he now appeals to this Court for relief.

## II.

¶11. In his first assignment of error, Dancer asserts he was in custody when he was taken to the police station to be interviewed and that he did not knowingly and intelligently waive his rights and freely and voluntarily confess. He relies, in part, upon the fact that he was thirteen-years-old at the time, that he had no prior involvement with the criminal justice system and that he performed at a low national average on standardized achievement tests. According to Dancer's appellate counsel, Dancer did not comprehend that he would be placed under arrest because he did not understand that he had made incriminating statements.[2] In short, counsel for Dancer argues that special precautions should have been taken to ensure that thirteen-year-old Dancer understood his constitutional rights and how to invoke them, citing *Morgan v. State*, 681 So. 2d 82, 94 (Miss. 1994) (McRae, J., dissenting).

¶12. The State counters the record is replete with evidence that Dancer voluntarily responded to law enforcement and offered to help give them clues to the killing. The State further asserts he was not under arrest and that Dancer was placed under arrest only after he voluntarily gave an incriminating statement. In addition, Dancer could read and write and he scored above the national average on several sections of the standardized achievement tests. In short, the State posits there is no merit to this assignment of error. The State's position is well-taken.

¶13. The first issue that must be addressed is whether Dancer was under arrest when he told the

officers the "white men from Alabama" story. "'An arrest within the meaning of the criminal law is the taking into custody of another person by an officer or a private person for the purpose of holding him to answer for an alleged or suspected crime.'" *Blue v. State*, 674 So. 2d 1184, 1202 (quoting *Smith v. State*, 229 So. 2d 551, 556 (Miss. 1969)), *cert. denied*, 117 S.Ct. 588 (1996). "'One who voluntarily accompanies an officer to a place where he may be interviewed is not under arrest.'" *Id.*

¶14. Here, Commander Freshour asked Dancer while canvassing the neighborhood if he would go to the police station for an interview. Dancer agreed. As Freshour testified, he did not think that Dancer had anything to do with the crime. He did believe, based upon Dancer correctly naming the items that were stolen from the store and that the victim had been stabbed, that the teenager witnessed the crime. Thus, he was asked to give a statement as a witness. Dancer was not handcuffed, and he rode in the front of the patrol car -- all of which indicates that he was not under arrest or even a suspect. In addition, his bike was taken to the station as well so that after the investigators took his statement he could go home.

¶15. Once at the station, Dancer related the same "white men from Alabama" story. Not believing a word he said, one of the investigators told him to go home as they did not have time for games. Again, this signaled that Dancer was not under arrest or even suspected. In the interrogation room, Dancer again related the same story for a long period of time. Like Freshour, the investigators did not believe Dancer's story, but they suspected that he had either heard something on the streets about it or witnessed the crime. Thus, they continued to talk to him. One of the investigators noticed a stain on Dancer's tennis shoes. He asked if it was blood. In response to this query, Dancer made his first incriminating statement -- that he did not kill Welch, that he did not stab her. It was at this point that Dancer was *Mirandized*.

¶16. We conclude that before the incriminating statement Dancer was not under arrest. He volunteered to go to the police station for an interview. In fact in one of his confessions he stated that he made up the "white men from Alabama" story because he feared for his life. Not until he incriminated himself was Dancer suspected in the crime, and when he made the comments he was properly given his rights. Thus, his contention that he was under arrest from the moment he agreed to give a statement is without merit.

¶17. Turning to his assertion that his confession was not voluntary and a product of his low intelligence, the general rule is that for a confession to be admissible it must have been given voluntarily and not given because of promises, threats or inducements. *Morgan v. State*, 681 So. 2d 82, 86 (Miss. 1996) (citing *Chase v. State*, 645 So. 2d 829, 838-39 (Miss. 1994)). "[T]he prosecution shoulders the burden of proving beyond a reasonable doubt that the confession was voluntary." *Morgan*, 681 So. 2d at 86 (citing *Haymer v. State*, 613 So. 2d 837, 839 (Miss. 1993)). This "'burden is met and a prima facie case made out by testimony of an officer, or other persons having knowledge of the facts, that the confession was voluntarily made without threats, coercion, or offer of reward.'" *Morgan*, 681 So. 2d at 87 (quoting *Chase*, 645 So. 2d at 838) (quoting *Cox v. State*, 586 So. 2d 761, 763 (Miss. 1991)).

¶18. In *Stokes v. State*, 548 So. 2d 118, 122 (Miss. 1989), we held that when the circuit court expressly or implicitly resolves the issue of admissibility of a confession against a defendant, the scope of review is confined to the established limits. In *Alexander v. State*, 610 So. 2d 320 (Miss.

1992), we set out those limits:

> This is essentially a fact-finding function. So long as the court applies the correct legal standards, "we will not overturn a finding of fact made by a trial judge unless it be clearly erroneous [or contrary to the overwhelming weight of the evidence]."

*Alexander*, 610 So. 2d at 326 (citations omitted). Where, on conflicting evidence, the lower court admits a statement into evidence this Court generally must affirm. *Morgan*, 681 So. 2d at 87; (citing *Alexander*, 610 So. 2d at 326); *McGowan v. State*, 706 So. 2d 231, 235 (Miss. 1997).

¶19. Furthermore, there is no per se rule that mental retardation renders a confession involuntary and inadmissible. *McGowan*, 706 So. 2d at 235 (citing *Blue*, 674 So. 2d at 1205; *Gator v. State*, 402 So. 2d 316 (Miss. 1981)). "Instead, the mental abilities of an accused are but one factor to be considered in determining whether the confession was knowingly, intelligently and voluntarily made." *McGowan*, 706 So. 2d at 235 (citing *Neal v. State*, 451 So. 2d 743, 756 (Miss. 1984)). Whether there was an intelligent, knowing and voluntary waiver is essentially a factual inquiry to be determined by the trial judge from the totality of the circumstances. *McGowan*, 706 So. 2d at 235 (citing *Neal*, 451 So. 2d at 753). The United States Supreme Court in *Fare v. Michael C.*, 442 U.S. 707 (1979), held that an inquiry into the totality of the circumstances is necessary when determining if the statement of a juvenile during custodial interrogation is admissible. That Court stated:

> This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. . . .

*Id.* at 725.

¶20. In the instant matter, the trial court held a preliminary hearing to determine whether Dancer voluntarily confessed and whether his mental abilities affected that voluntariness. After listening to the evidence, the court allowed the confessions into evidence. That evidence included information that Dancer was thirteen-years-old at the time of the confession, that he could read and write and that he had completed the sixth grade. All of the officers testified that Dancer was not threatened, coerced or promised anything. Dancer did not testify at the hearing on the motion to suppress and no witnesses were called on his behalf.

¶21. The State offered into evidence Dancer's statements, including the taped version of his first statement, on which Dancer stated that he understood his rights and that he was acting freely and voluntarily. This taped statement was reduced to a written version that was signed by Dancer and witnessed by the investigators.

¶22. Based upon the evidence presented at the suppression hearing, the trial court concluded that Dancer's confessions were voluntarily given and therefore admissible. There is no record evidence before this Court which suggests that the trial court did not apply the proper standard and that the lower court's determination regarding Dancer's confessions was manifestly in error or contrary to the overwhelming weight of the evidence. *See Foster v. State*, 639 So. 2d 1263, 1281 (Miss. 1994) (affirming trial court's determination regarding admissibility of seventeen-year-old's confessions

where evidence and testimony showed they were voluntarily given with a knowing and intelligent waiver of his constitutional rights).

¶23. Regarding Dancer's claim of mental infirmities that affected his ability to understand what was happening, *McGowan* is instructive. There, the defendant put on evidence that his reading level was somewhere between the fourth and fifth grade, that his overall IQ was 55, that he was afraid if he did not talk the death penalty would be imposed on him, that he was told to sign the statement and waiver form without it being read to him and that he could not read the statement himself. We rejected McGowan's involuntary claim, finding that the "sparse information" regarding his mental capacity did not underscore any manifest error in the trial court's decision-making process. In short, we concluded there was no overwhelming evidence that McGowan could not effectively waive his *Miranda* rights.

¶24. Such is the case here. First, there was no evidence or testimony presented at the suppression hearing regarding Dancer's mental weakness. During trial, Dancer presented the testimony of Dr. Bob Hudson, assistant superintendent for the Columbus City Schools, who was responsible for interpreting students' test scores on the Stanford Achievement Tests and the Iowa Test of Basic Skills. Dr. Hudson testified that Dancer fell "somewhat below average" on the overall Iowa Test in 1994. On a national level, he was in the sixteenth percentile. On the Stanford Achievement Test in 1992, Dancer scored in the eleventh percentile nationally and the eighth percentile state-wide. In 1993, he scored at the eighth percentile on a national level on the Stanford Test, and in 1994 he scored in the fourth percentile on a national level on the same test.

¶25. On cross-examination, it was pointed out the tests were achievement tests and not IQ tests and that one could have a relatively high IQ but still score quite poorly on an achievement test. Doctor Hudson conceded the tests did not indicate whether Dancer could function in society, that he was not "street smart" or that he could not relate the truth of events he witnessed or experienced. The prosecutor also examined the doctor about specific sections of the achievement tests, such as the evaluation reading or interpretation section. There, Dancer scored in the fifty-seventh percentile, which was above the national average of forty-six. Likewise, in the spelling section Dancer scored in the sixtieth percentile, while the national average was fifty-five percent. Still further in the expression category which measures the ability to express one's ideas or meaning, Dancer scored forty percent, and the national average was only fifty-one percent. In math skills, Dancer scored within the national average. In the "remembering section," Dancer scored right at the national average with fifty percent. The national average was fifty-two.

¶26. The State introduced Dancer's cumulative school records, which showed that from first to fourth grade his scores were satisfactory -- in the mid to lower eighties. It was only in the fifth grade that his scores decreased. It was also pointed out that Dancer had missed many school days in the fifth and sixth grade.

¶27. Considering the evidence presented regarding Dancer's intelligence, we simply find no overwhelming evidence that Dancer could not effectively waive his *Miranda* rights. Moreover, the taped conversation involving Dancer belies his assertions that he did not understand what was going on or the consequences of his actions. Furthermore, counsel for Dancer wholly failed to bring forth any evidence at the suppression hearing or trial regarding his IQ. The trial court did not err in

denying Dancer's motion to suppress his statements. This assignment of error is without merit.

### III.

¶28. In his final assignment of error, Dancer claims the trial court erred in overruling his objection to the prosecutor's prejudicial and inflammatory remarks in closing arguments. Specifically, he objected to the following comments:

> Now, the question is, whatever will you do with him? Will you pretend that this never happened and act like nothing occurred? Will you ask me, why can't you do something else with him? Why should he be up here? Isn't there something else you can do with a 13 year old? Ladies and gentlemen, there are no other options. Either he is criminally responsible for his act or he walks out the doors of this courtroom to your neighborhood.

¶29. Counsel for Dancer objected to the prosecutor's comment, but the objection was overruled. Dancer now argues the comment regarding him walking out of the courtroom into the jurors' neighborhood was improper.

¶30. The State responds the comment was not "on its face" inflammatory or prejudicial. Instead, the State posits it simply reiterated what defense counsel asked the jury to do -- find the "little boy" was just scared and not involved but just happened to be there. Additionally, the State emphasizes the fact that Dancer was from Lowndes County, the crime was committed in Lowndes County, the jury was chosen from Lowndes County and the trial took place in Lowndes County. Thus, in the view of the State the comment was factual and proper.

¶31. Of course, that a statement is factual does not necessarily make it proper. "Any allegedly improper prosecutorial comment must be evaluated in context, taking into consideration the circumstances of the case when deciding the comment's propriety." *Davis v. State*, 660 So. 2d 1228, 1248 (Miss. 1995) (citing *Ahmad*, 603 So. 2d 846, 843 (Miss 1992)). The test for determining if improper argument by the prosecutor to the jury requires reversal is "whether the natural and probable effect of the improper argument of the prosecuting attorney is to create an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created." *Davis*, 660 So. 2d at 1248 (quoting *Davis v. State*, 530 So. 2d 694, 701 (Miss.1988)). Prosecutors are afforded the right to argue anything in the State's closing argument presented as evidence. *Hanner v. State*, 465 So. 2d 306, 311 (Miss. 1985) (citing *Zant v. Stephens*, 462 U.S. 862 (1983)). However, arguing statements of fact that are not in evidence or necessarily inferable from it which are prejudicial to the defendant is error. *Tubb v. State*, 217 Miss. 741, 744, 64 So. 2d 911 (1953). Prosecutors should refrain from doing or saying anything that would tend to cause the jury to disfavor the defendant due to matters other than evidence relative to the crime. *Sumrall v. State*, 257 So. 2d 853, 854 (Miss. 1972).

¶32. In *Banks v. State*, No. 95-KA-00215-SCT, 1997 WL 751940 at *6 (Miss. Dec. 08, 1997), this Court was concerned with the prosecutor's closing argument that while the jury had the opportunity to set Banks free, the prospect "that Banks will walk out of this courthouse was perhaps the most frightening part . . ." We concluded the comment ran dangerously close to an argument based on the future danger Banks posed to society, rather than on the facts adduced at trial. This Court has held that appealing to the fears of jurors is impermissible. *See Williams v. State*, 544 So. 2d 782 (Miss.

1987). An argument suggesting the "frightening" prospect of a defendant going free is likewise inappropriate. *Banks*, 1997 WL 751940, at *7.

¶33. In the instant case, the prosecutor's comment regarding Dancer going free in the jurors' neighborhood is very analogous to the argument rejected by us in *Banks*. Here, the prosecutor was not arguing a statement of fact that was in evidence or that was even relevant to the issue before the jury -- Dancer's guilt or innocence. The statement was made with the intent to frighten the jurors, and such a tactic is impermissible. Still, albeit improper the comment does not constitute reversible error.

¶34. As set forth in *Craft v. State*, 226 Miss. 426, 435, 84 So. 2d 531 (1956), the test to determine whether an improper argument by a prosecutor requires reversal is whether the natural and probable effect of the improper argument of the prosecuting attorney is to create an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created. In *Clemons v. State*, 320 So. 2d 368, 372 (Miss. 1975), we explained that we would not withhold a reversal where prosecutorial comments are so inflammatory that in the judgment of this Court they influenced the verdict of the jury and therefore prevented a fair trial.

¶35. The improper comment made here, however, was harmless and did not so influence the jury that Dancer was not afforded a fair trial. The evidence of Dancer's guilt was overwhelming, primarily his voluntary confessions about his participation in the armed robbery and murder. In light of this evidence, it cannot be said that the natural and probable effect of the prosecutor's comment was to create unjust prejudice against Dancer which resulted in a verdict influenced by this prejudice. Dancer's contentions to the contrary are without merit and do not entitle him to any relief.

## IV.

¶36. For the above-cited reasons, Dancer's convictions for armed robbery and murder along with his sentences of life and thirty years imprisonment are affirmed.

¶37. **COUNT I: CONVICTION OF ARMED ROBBERY AND SENTENCE OF THIRTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. SENTENCE IN COUNT I TO RUN CONCURRENTLY WITH SENTENCE IMPOSED IN COUNT II. COUNT II: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**SULLIVAN AND PITTMAN, P.JJ., McRAE, ROBERTS, SMITH, MILLS AND WALLER, JJ., CONCUR. PRATHER, C.J., NOT PARTICIPATING.**

---

1. Commander Freshour testified it was significant to him that Dancer mentioned the woman had been stabbed because the police department had not released any information about the manner of death. The defense put on evidence, however, that on the Friday and Saturday six o'clock p.m. news broadcast it was stated the victim died of stab wounds.

2. At the conclusion of the interrogation, Dancer told the investigators that he would be in touch if he heard any more information on the streets. He then proceeded to get up and leave the room. It was at this point that he was placed under arrest.