# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 97-KA-01120-SCT

*NEIL KIRCHER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/24/1997 |
| TRIAL JUDGE: | HON. ROBERT LOUIS GOZA, JR. |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | W. E. GORE, JR. |
| | VAUGHN DAVIS, JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEAN SMITH VAUGHAN |
| DISTRICT ATTORNEY: | RICHARD D. MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/14/1999 |
| MOTION FOR REHEARING FILED: | 11/12/99; denied 01/13/2000 |
| MANDATE ISSUED: | 01/20/2000 |

**EN BANC.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. This case comes to this Court on appeal of Neil Kircher from the Rankin County Circuit Court, where Kircher was convicted for the murder of Bob McCrary, an employee of the Rankin County Sheriff's Office, who pursued Kircher after Kircher stole a knife from the Jitney Jungle and a vehicle in which the keys had been left from that same parking lot. He was sentenced to a term of life in the custody of the Mississippi Department of Corrections. Kircher filed a motion for new trial, which was denied by the trial judge, thus prompting this appeal.

¶2. This Court, having carefully considered the issues raised by Kircher, finds no merit to his claims. Two of the issues raised warrant little discussion. However, we find that Kircher's claim that the trial court erred in failing to suppress his confession, given to law enforcement officers while in the emergency room, warrants close scrunity. We note that the trial court applied the proper legal standard, considered the totality of the factual circumstances, and correctly held that Kircher's confession was admissible.

*O'Halloran v. State*, 731 So. 2d 565 (Miss. 1999).

¶3. This issue is close, and law enforcement officers are advised to always use caution when attempting to take a statement under such circumstances. However, having intensely examined this record, we cannot say that the trial judge's ruling allowing admissibility of the emergency room confession, resolved on conflicting evidence considering the totality of the circumstances, was manifest error. Nor do we find that his decision was contrary of the overwhelming weight of the evidence. *Wright v. State*, 730 So. 2d 1106, 1108 (Miss. 1998). Generally, this Court must affirm the trial court under such proper application of the correct legal standard and findings based on the totality of the circumstances considering the disputed evidence offered by both the State and the defense. *Stokes v. State*, 548 So. 2d 118, 122 (Miss. 1989). We therefore affirm the trial court.

## STATEMENT OF FACTS

¶4. Neil Kircher (Kircher) was a voluntarily admitted patient at COPAC, an in-patient drug and alcohol treatment center located in Rankin County. On August 28, 1995, Kircher, along with other COPAC members, was taken to the Jitney Jungle grocery store on Spillway Road in Rankin County. While at the Jitney Jungle, Kircher noticed a vehicle in the parking lot with the keys still in the ignition. Kircher entered the Jitney Jungle to purchase groceries. After purchasing groceries with other residents, Kircher went back into the store alone and stole a butcher knife. He then stole a Ford truck from the parking lot which had the keys left in the ignition.

¶5. Bob McCrary, shop foreman with the Rankin County Sheriff's Department, was in pursuit of Kircher shortly after being notified of the stolen vehicle. After a short chase, Kircher stopped the stolen Ford truck. Kircher sped off again, but could not out run McCrary, and Kircher stopped again on the roadside. McCrary also stopped his vehicle and remained in radio contact with other officers. Shortly thereafter, McCrary was stabbed by Kircher with a butcher knife. McCrary radioed the other officers informing them that he had been stabbed.

¶6. Kircher then drove to another area of Rankin County where he stopped near a church. Kircher exited the stolen vehicle and ran into a cotton field. While in the cotton field, Kircher stabbed himself twice; once in the chest and once in the abdomen. Additional Rankin County officers, as well as other law enforcement deputies, immediately appeared on the scene, arrested Kircher and called for an ambulance.

¶7. Chief Investigator Ronnie Pennington, with the Rankin County Sheriff's Department, arrived on the scene. Pennington asked the other deputies if any kind of weapon had been found, whereupon Kircher simply responded to the question volunteering that the weapon was in the yard. Pennington saw an unidentified object in

the direction that Kircher had related the weapon was located. Pennington immediately went to that area to which Kircher had directed him and found a bloody shirt and a butcher knife. These items were sent to the crime lab for analysis. The butcher knife was similar to a knife that was sold in Jitney Jungle. The ambulance arrived and transported Kircher to the hospital.

¶8. Upon arriving at the emergency room, at 1350 hours Kircher was treated and prepared for surgery. It appears from the record that Kircher was in the emergency room for at least one and a half hours. A blood sample from Kircher was secured.

¶9. Officer Pennington had immediately followed the ambulance to the emergency room. Officer Pennington saw the emergency room doctor as he arrived at the door to the emergency room. Officer Pennington asked the physician, Dr. Stephen Chouteau, "if he [Kircher] was in any kind of shape for me to talk with him." Dr. Chouteau replied, "Sure."

¶10. Dr. Chouteau testified that at the time he authorized Officer Pennington to speak with Kircher, Kircher was stable, alert, and oriented, and that Kircher was not in shock. Dr. Chouteau testified that upon admission, Kircher's blood pressure was 100/60, but that later, while Kircher was still in the emergency room, his blood pressure was 135/70. Dr. Chouteau, when asked how much blood was given to Kircher, stated, "I believe he got one unit or one started. And after one was given he - - may have actually started on two." Dr. Chouteau opined that, [Kircher] "stablized fairly quickly in the emergency room." Exhibit D4 to the record reflects that Kircher, "did not require anymore blood transfusions postoperative." When asked about when Kircher was administered morphine sulfate, Dr. Chouteau stated, "I did not, not in the emergency room." I saw there was a notation for morphine in one of the ICU notes." Dr. Chouteau opined that Kircher had the capability to understand questions or statements read to him and questions asked of him at that time. Hospital records reflect that there was no internal damage to any of Kircher's vital organs.

¶11. Marianne Rainer, a registered nurse, who attended Kircher in the emergency room, testified that during the approximate one and one-half hours that Kircher was in the emergency room, she had "one on one" contact with him. She stated that Kircher was "a very nice young man, very composed, quiet, cooperative, very polite, did not appear to be upset, and that he reacted and answered all questions readily with pertinent answers." She opined that Kircher was "not in distress, was not hypertensive and was not in shock." She also corroborated that she heard Officer Pennington advise Kircher of his *[Miranda](#)* rights.

¶12. As noted, Officer Pennington sought the attending doctor's permission to speak with Kircher. Before Pennington spoke with Kircher, Deputy Bradshaw, also of the

Rankin County Sheriff's Department, handed the *Miranda* card to Pennington. Officer Pennington then proceeded into the room with Kircher. Officer Pennington introduced himself and the three other officers. Pennington then asked Kircher if he was willing to talk about the things that happened earlier that day. Kircher answered affirmatively, to which Officer Pennington responded by saying, "Well, before you do, let me advise you of your rights." Pennington testified that he asked Kircher if he understood the rights read to him. Kircher responded that he understood the rights as read to him. Kircher answered Pennington's questions regarding the events of earlier that day. The testimony of Officer Pennington regarding the communications with Kircher was corroborated by the testimony of the other three officers present at the confession.

¶13. Officer Pennington testified that, after being advised of his rights, Kircher admitted that he had stolen a knife, stolen a truck, and had noticed a vehicle following him as he drove along the highway. Kircher tried to outrun the vehicle, but could not do so. Kircher stopped his vehicle once, and the vehicle that was following him also stopped. Kircher "gave it the gas" and again tried to outrun the vehicle which continued to follow him. He was unable to outrun the vehicle and pulled over to the side of the road for a second time. The truck that was following pulled in behind Kircher's stolen truck. Officer Pennington then related that Kircher stated "he pulled the knife out and stabbed the subject." "His [McCrary's] vehicle was still in gear, and he give it the gas. He [Kircher] said he was holding onto the open window; and as the truck was trying to get away, he stabbed him several more times." Kircher stated that he did not know the person in the truck was a sheriff's officer, and he admitted that the person was unarmed. Kircher also admitted that he had stolen the knife from of the Jitney Jungle store shortly before the killing. Officer Pennington stated that the entire conversation with Kircher took only approximately five minutes.

¶14. The State's case in chief proceeded with the testimony of other officers regarding the crime scene. Then, Michael Atkinson, an employee of COPAC, testified that he transported Kircher and other residents to the Jitney Jungle store on August 28, 1995.

¶15. Richard Fisher, an employee of Jitney Jungle, testified that he had previously identified Kircher from a six picture pictorial lineup and also identified him at trial as being the person who came back into the store alone and asked where the knives were located.

¶16. Charles Smith, testified that he was driving the Ford truck, owned by Thorn Construction Co. which was stolen from the parking lot that day because he had left the keys in the ignition.

¶17. James Harkins, a truck driver hauling logs, testified that he was traveling east of the Pisgah school on Highway 43, when he observed two pickup trucks on the side of

the road. His descriptions of the trucks corresponded with the descriptions of the stolen Ford truck and the truck driven by McCrary. Harkins testified that he saw the Rankin County Sheriff's Office insignia on the side of McCrary's truck . He further testified that "this guy runs across -- that was standing beside the pickup, ran across the road to the Ford pickup. . . ." Harkins further testified that the driver of the Ford pickup passed him shortly thereafter and that the Ford pickup was traveling at probably 80 mph.

¶18. Dr. Stephen Hayne, practicing anatomic, clinical and forensic pathology, was accepted by the Court and testified as the State's expert forensic pathologist. He conducted an autopsy on McCrary's body. He stated that McCrary was stabbed 13 times, predominantly over the chest, right arm, as well as the left shoulder area. He stated that additionally, there was one wound to the left temple area of McCrary's face. One stab wound went completely through McCrary's body making a fourteenth hole. Dr. Hayne opined that stab wounds numbered 3, 5, 7, 8 and 9 were all lethal wounds, which caused McCrary's death. He also opined that McCrary died due to homicide. He collected two samples of McCrary's blood which were submitted to the crime lab.

¶19. Peggy Jackson testified identifying certain landmarks and objects depicted in the pictures admitted into evidence by the State. She described seeing an individual jump from a pickup truck near her house and run fast towards the church. She thought that he was in trouble and needed help, but although she left her house and went across to the church, he avoided her and ran off behind her house into a cotton field. She stated that law enforcement officers arrived about that time. One of those officers, Deputy Richard Blackburn testified that he found Kircher in the cotton field and arrested him.

¶20. Clydell Morgan, a forensic scientist with the Mississippi State Crime Lab, testified that he was asked to process the two vehicles involved in a homicide: the Rankin County Sheriff's office truck of victim McCrary, and the stolen vehicle Kircher was driving. He testified that he recovered an envelope and a blue sheet-like rag from the floorboard passenger side of the Ford (Kircher's vehicle). Morgan transported these items to the crime lab and sent them both to serology for analysis.

¶21. Kathy Brock, a forensic scientist specializing in forensic serology testified that she examined these items and found blood upon them. Brock also examined the shirt that Officer Pennington recovered at the scene. She compared the known samples of blood taken from McCrary and from Kircher. She examined "one long-sleeve shirt from the suspect with possible blood stains." She opined that the blood she found on the right shoulder of the shirt was type A. She then opined that McCrary's blood sample was alsoType A, consistent with the that found on the shirt. She further testified that she examined the blue rag removed from the stolen Ford vehicle. Blood was found on the rag, which she opined was also Type A. Finally, she testified that Ex.

31, labeled "Neil Kircher," was blood Type B. She found both blood Types A and B on the left sleeve of the recovered shirt.

¶22. Kircher did not plead not guilty by reason of insanity. Neither did he contest the statement that he voluntarily made to Officer Pennington in the cotton field. Instead, he maintained that his confession in the emergency room was made while he was involuntarily intoxicated. The confession, and the circumstances which led to the statement, were the subject of a Motion to Suppress filed by Kircher. At the suppression hearing, Kircher testified that he could not remember word for word what was asked of him. Kircher testified that he could not remember his rights being read to him. Kircher remembered only going to Jitney Jungle, the cotton field, and the emergency room. Kircher stated that he tried to answer every question asked of him because he was trying to get people away from him.

¶23. The defense then called Dr. William Owen, who was accepted as an expert in the field of forensic psychiatry. Dr. Owen had examined Kircher's COPAC file, hospital file, and some one year after the incident had interviewed Kircher approximately four times while he was in jail. Dr. Owen testified that, in his opinion, Kircher was not capable of freely and voluntarily making a confession to the murder. Contrary to the testimony of the four officers present at the confession, the testimony of Dr. Chouteau, and attending nurse Rainer, Dr. Owen expressed his opinion that Kircher was involuntary drug intoxicated and in shock at the time of the confession.

¶24. After the suppression hearing, the trial judge found that the confession was voluntary and denied the motion to suppress. After trial, the jury returned a unanimous verdict of guilty on the charge of murder, and Kircher was sentenced to life in the custody of the Mississippi Department of Corrections. Kircher's motion for new trial or, alternatively, for judgment notwithstanding the verdict was heard and denied.

¶25. Feeling aggrieved, Kircher filed this appeal and raises the following issues:

**I. THE TRIAL COURT ERRED IN FAILING TO SUPPRESS THE STATEMENT GIVEN BY KIRCHER.**

**II. THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO SUSTAIN DEFENDANT'S OBJECTION TO IMPROPER CROSS EXAMINATION BASED ON COLLATERAL MATTER AND THE IMPROPER USE OF GRAND JURY SUBPOENA POWER.**

**III. THE TRIAL COURT ERRED IN NOT GRANTING DEFENDANT'S MOTION FOR NEW TRIAL.**

## LEGAL ANALYSIS

## I. THE TRIAL COURT ERRED IN FAILING TO SUPPRESS THE STATEMENT GIVEN BY KIRCHER.

¶26. Kircher contends that there was insufficient factual evidence to support the trial court's failure to suppress his statements. The United States Supreme Court pronounced the law regarding the admissibility of a defendant's waiver of his privilege against self-incrimination under the Fifth Amendment in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966). *Miranda* requires proof that the waiver was voluntarily, knowingly, and intelligently made. *Id.* at 444.

¶27. The standard of reviewing the admission of a confession is well-settled. "Determining whether a confession is admissible is a finding of fact which is not disturbed unless the trial judge applied an incorrect legal standard, committed manifest error, or the decision was contrary to the overwhelming weight of the evidence." *Wright v. State*, 730 So.2d 1106, 1108 (Miss. 1998) (quoting *Lee v. State*, 631 So.2d 824, 826 (Miss. 1994)). *See also Willie v. State*, 585 So. 2d 660, 665 (Miss. 1991).

¶28. The voluntariness of a waiver, or of a confession, is a factual inquiry that must be determined by the trial judge from the totality of the circumstances. *O'Halloran v. State*, 731 So.2d 565, 570 (Miss. 1999); *Gavin v. State*, 473 So.2d 952, 954 (Miss. 1985); *Stevens v. State*, 458 So.2d 726, 729 (Miss. 1984). No one factor is dispositive in the totality of circumstances test. *Johnson v. State*, 511 So.2d 1360, 1365 (Miss. 1987). "The applicable standard for determining whether a confession is voluntary is whether, taking into consideration the totality of the circumstances, the statement is the product of the accused's free and rational choice." *Herring v. State*, 691 So.2d 948, 956 (Miss. 1997). Once a determination of voluntariness is made by the trial court, the defendant bears a heavy burden in attempting to reverse the trial court's finding that the confession is admissible. *Blue v. State*, 674 So. 2d 1184, 1204 (Miss. 1996).

¶29. At the time of his confession, Kircher was in the emergency room with two self-inflicted stab wounds, neither of which turned out to be life threatening. After receiving permission from Dr. Choateau to talk with Kircher, Officer Pennington entered the room with three other deputies. Pennington asked Kircher whether he wanted to talk. Kircher responded in the affirmative. Pennington then advised Kircher of what he was charged and read him his *Miranda* rights. Kircher stated that he understood the rights read to him by Officer Pennington and gave a detailed statement as to the stabbing death of the victim.

¶30. Kircher now contends that he did not intelligently waive his rights. The test to determine whether a defendant's rights were intelligently waived is:

whether the words used by the officers, in view of the age, intelligence and

demeanor of the individual being interrogated, implied a clear understanding of all of his rights. The court must then determine objectively whether the words used by the interrogating officers were sufficient to convey the implied warning.

*Jenkins v. State*, 214 So. 2d 470, 472 (Miss. 1968).

¶31. When the voluntariness of a confession is questioned, the defendant has a due process right to a determination that the confession was in fact voluntarily given. *Stokes v. State*, 548 So.2d 118, 121 (Miss.1989). The procedural rule of *Agee v. State*, 185 So. 2d 671, 673 (Miss. 1966), requires that the trial court hold an evidentiary hearing upon the accused's testimony that the confession was involuntarily given. The State bears the burden of proving all facts prerequisite to admissibility beyond a reasonable doubt. *Cox v. State*, 586 So. 2d 761 , 763 (Miss. 1991); *Neal v. State*, 451 So.2d 743, 753 (Miss.1984), *cert. denied*, 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984). "This burden is met and a prima facie case made out by the testimony of an officer, or other person having knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward." *Cox*, 586 So. 2d at 753 (citing *Agee*, 185 So.2d at 673). After the State has made out its prima facie case, the defendant must rebut the State's evidence by offering testimony that violence, threats of violence, or offers of reward induced the confession. *Id.*

¶32. At the suppression hearing, in accordance with the *Agee* rule, the State presented testimony of the four law enforcement officers present at the confession, who all stated that the statement was free and voluntary and made without threats, coercion, or offer of reward. They testified that Kircher stated he understood the *Miranda* rights as read to him by Officer Pennington. All of the officers testified that Kircher seemed alert and willing to talk. Most importantly, Officer Pennington asked Dr. Chauteau for permission to talk with Kircher prior to taking the confession. The officers testified that Kircher gave clear answers as to what occurred regarding the killing of McCrary.

¶33. Additionally, the emergency room nurse, Marianne Rainer, who personally attended to Kircher, testified that Kircher seemed alert and calm and did not appear to be in that much pain at the time of questioning. She stated that Kircher gave pertinent answers to questions and that Kircher seemed composed and answered questions readily. Nurse Rainer corroborated that Officer Pennington had in fact advised Kircher of his *Miranda* rights, of which she was aware due to watching television programs.

¶34. Furthermore, the emergency room physician, Dr. Chouteau, testified that although Kircher's blood pressure was a little low initially, his other vital signs were normal. Dr. Chouteau stated that at the time he authorized the officers to speak with Kircher, Kircher was alert, oriented, and that Kircher was not in shock. In fact, the record

reflects that Kircher's blood pressure improved shortly thereafter to 135/70. Dr. Chouteau was absolutely sure that no morphine sulfate was administered to Kircher in the emergency room.

¶35. Upon the State's presentation of a prima facie case of admissibility, the burden shifted to Kircher to provide evidence to rebut the State's assertion. *Cox*, 586 So. 2d at 763 (citing *Agee*, 185 So.2d at 673). Kircher argues that he presented sufficient evidence of his condition at the time of the confession to meet his burden of showing the involuntariness of his statement. Kircher contends that: (1) he did not recall having any rights recited to him; (2) he was in early stages of shock; (3) he had lost one quart of blood and had received several doses of morphine; (4) he had been prepared for surgery; (5) he was suffering from drug intoxication from the wrongfully prescribed anti-depressant medication; (6) he was mentally distraught and voiced to the law enforcement officers his desire to die; (7) he had already attempted suicide by stabbing himself in the abdomen and chest; (8) he was in pain, and during the interrogation lay on the hospital gurney groaning and grimacing; (9) he was presented no waiver of rights form, nor was the waiver process and procedure explained to him at any time during the interrogation; (10) he was eighteen years old and from a foreign state away from friends and family; (11) he was suffering from two personality disorders; (12) he had been losing sleep as a result of the anti-depressant medications prescribed at COPAC; and (13) he had an intravenous drip in his arm.

¶36. Kircher argues that after reviewing and considering the foregoing facts and considering the totality of the circumstances, the trial court's determination that Kircher's statement was freely and voluntarily given was erroneous. Kircher contends that his mental condition at the time of the confession rendered him incapable of intelligently waiving his rights. Specifically, Kircher points to drugs prescribed at COPAC as well as drugs that he claims were administered to him at the hospital and argues that he was involuntarily intoxicated. However, we note that Kircher did not plead insanity, and his expert, Dr. Owen, clearly acknowledged that Kircher knew right from wrong under the *M'Naughten* rule. The State did not need to offer testimony from the expert who had examined Kircher at Whitfield, regarding Kircher's sanity, because sanity is not at issue here. Kircher had also voluntarily admitted himself into the COPAC unit for treatment, and now claims that doctors there gave him certain antidepressant drugs which influenced his involuntary intoxication during the killing and subsequent confession. Dr. Owen, Kircher's expert, was clearly allowed to state his opinion to the judge and jury that Kircher was under the influence of involuntarily intoxicating drugs. Additionally, the jury was subsequently instructed in Instruction D-6 as follows:

> The Court instructs the jury that if a person is in an intoxicated or drugged condition which has been involuntarily produced and deprives him of his capacity

to appreciate the criminality of his conduct or to conform his conduct to the requirements of law then the intoxicated or drugged condition may be considered in determination of the existence of malice aforethought as an element of the offense charged.

If you believe from the evidence in this case that at the time Robert McCrary was killed, that Neil Kircher's mental capacity was impaired by the antidepressant drugs which were administered to him by a licensed physician while he was committed to a treatment center and said evidence raises any reasonable doubt in you mind whether Neil Kircher formed the necessary malice aforethought and specific intent to kill then you must find Neil Kircher not guilty of murder and then consider the offense of manslaughter.

¶37. In *Blue v. State*, 674 So. 2d 1184 (Miss. 1996), this Court held that the mental condition of a defendant does not in and of itself render the confession inadmissible, but instead "[is] but one factor to consider among the totality of the circumstances of a confession and interrogation." *Id.* at 1205 (citing *Neal v. State*, 451 So. 2d 743 (Miss. 1984)). This Court has stated that "[i]ntoxication or sickness does not automatically render a confession involuntary. The admissibility of a confession depends on the degree of intoxication." *Johnson v. State*, 511 So. 2d 1360, 1365 (Miss. 1987). This is exactly the issue posed here; whether Kircher was involuntarily intoxicated and to what degree, if any?

¶38. Here, the learned trial court had disputed evidence submitted to him by the State and defense regarding Kircher's degree of intoxication. The State claimed that Kircher was not involuntarily intoxicated, and the defense argued otherwise. The trial court resolved the issue applying the correct legal standard and considered the totality of the circumstances in arriving at his decision that the confession was free and voluntary. Again, the applicable standard for determining whether a confession is voluntary is whether, considering the totality of the circumstances, "the statement is the product of the accused's free and rational choice." *Herring v. State*, 691 So.2d 948, 956 (Miss. 1997). This Court has stated, in addressing whether a confession to murder was voluntarily given, "Where, on conflicting evidence, the court [resolves the issue of admissibility of a confession against a defendant] this Court generally must affirm." *Stokes v. State*, 548 So. 2d 118, 122 (Miss. 1989), *cert. denied*, 493 U.S. 1029, 110 S.Ct. 742, 107 L.Ed.2d 759 (1990).

¶39. There is very little variation in the testimony of the law enforcement officers. In their opinion Kircher was alert, aware of his surroundings, and answered all their questions rationally, and thus, he voluntarily waived his *Miranda* rights read to him by Officer Pennington. Their testimony mirrors that of the attending doctor and nurse. The testimony of the emergency room physician, Dr. Chouteau, and the attending

nurse, Rainer, corroborates the officers' view that Kircher understood everything they asked, answered all their questions, was alert, stable, oriented and not in shock. Dr. Chouteau stated that no morphine sulfate was administered to Kircher in the emergency room, but rather that it occurred postoperatively and subsequent to being placed in the ICU.

¶40. Dr. Owen , Kircher's expert psychiatrist, testified contrary to the view expressed by the officers, emergency room doctor and nurse. Dr. Owen opined that Kircher was involuntarily intoxicated and thus could not have voluntarily consented to his emergency room confession. Kircher could not remember everything that was asked of him and remembered very few details about the incident.

¶41. The trial judge had all these factual circumstances before him, albeit conflicting evidence. He applied the correct legal standard, considered the totality of the circumstances, and held that Kircher's emergency room confession was free and voluntarily, and thus admissible. *Herring*, 691 So. 2d at 956. Kircher had a heavy burden to overcome, and he failed in that attempt. *Blue v. State*, 674 So.2d at 1184. A hospital emergency room setting where law enforcement officers seeking to question a defendant who may have been administered drugs is one in which officers should be very cautious because of obvious questions concerning voluntariness that may arise. Prior to questin a defendant in this situation, officers should always seek the permission of the attending physician, who is in a better posture to know a patient's condition. The officers here adhered to this word of caution.

¶42. The trial judge obviously gave greater weight to the testimony of the emergency room doctor and attending nurse, as well as to all of the law enforcement officers, when compared to the testimony of Kircher and his expert psychiarist, Dr. Owen. The trial court applied the correct legal standard, considered the conflicting evidence, and resolved the issue of admissiblity based on the totality of the circumstances. Thus, this Court generally must affirm. *Stokes,* 548 So. 2d at 122. Additionally, the trial judge allowed Kircher's expert, Dr. Owen, to testify regarding Kircher's involuntary intoxication. The jury heard and considered his testimony. Also, the jury was properly instructed by the trial judge with Instruction D-6 regarding the possible impairment of Kircher's mental capacity due to the drugs. We hold that the trial judge correctly found that the confession was free and voluntary, thus admissible in evidence.

¶43. Finally, we note that even were this error, which it is not, it would be harmless error in view of the overwhelming evidence against Kircher, all of which has been set out above. This Court in *Cannaday v. State*, 455 So. 2d 713 (Miss. 1984), held that the trial court's error in admitting the defendant's incriminating statement was harmless insofar as the guilt phase of the trial was concerned given the overwhelming evidence of guilt. In addition to the blood serology evidence implicating Kircher, there was eye

witness testimony identifying Kircher as the person who asked where the knives were kept in Jitney Jungle shortly before the killing. Other witnesses placed the stolen truck driven by Kircher at the scene of the killing and at the church near the cotton field to which Kircher was observed running shortly before the officers closed in and arrested him. The officers recovered Kircher's shirt and a knife upon being told by Kircher where to locate those items. Kircher did not contest his very incriminating statement made in the cotton field and made no attempt to suppress it. Also, in *Watts v. State*, 717 So. 2d 314 (Miss. 1998), this Court found harmless the error by the trial court in allowing evidence that the defendant used the money from the armed robbery for which he was convicted to purchase crack cocaine. Likewise, any suggestion of error here, although we clearly find none, is, nevertheless, harmless beyond a reasonable doubt in light of the overwhelming weight of the evidence against Kircher. There is no merit to this issue.

### II. THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO SUSTAIN DEFENDANT'S OBJECTION TO IMPROPER CROSS-EXAMINATION BASED ON COLLATERAL MATTER AND TO THE IMPROPER USE OF GRAND JURY SUBPOENA POWER.

¶44. Kircher next argues that the evidentiary rulings of the trial court with regard to the misuse of the grand jury subpoena power and the use of the records obtained thereby was an abuse of discretion requiring reversal. Specifically, Kircher contends that the trial judge erred in allowing the State to use documents obtained by grand jury subpoena to impeach defense witness Dr. William Owen, who was accepted by the court as an expert in the field of forensic psychiatry. Dr.Owen testified to the effects of drugs administered to Kircher which ultimately, in his opinion, rendered Kircher's confession allegedly involuntary.

¶45. The exchange objected to by Kircher concerned disciplinary proceedings before the Mississippi State Board of Medical Licensure regarding a restriction on Dr. Owen's medical license which prohibits Dr. Owen from performing surgical procedures. The order issued by the Board, found as State's exhibit 5, states that Dr. Owen falsified his application for medical privileges at Mississippi hospitals. Specifically, in an application for staff privileges at the Methodist Hospital in Marion County, Mississippi, Dr. Owen falsely stated that he had no limitations on his license to practice medicine. Notably, Dr. Owen also made the same false assertion in his application for medical staff privileges at Leake Memorial Hospital in Carthage, Mississippi. The Board's order states: "This board finds that the Licensee is not a trustworthy and honest provider."

¶46. Kircher argues that the questioning was improper because it involved a collateral matter. Kircher argues Dr. Owen's skill as a surgeon was not properly before the court

because Dr. Owen had neither been offered, tendered, nor accepted as a surgeon. Additionally, Kircher contends that Dr. Owen's skill as a surgeon is irrelevant to the opinions expressed regarding Kircher's mental condition and the effects of the medications which had been ingested by him.

¶47. Prior to promulgating the Mississippi Rules of Evidence, cross-examination of a witness about specific instances of past conduct for the purpose of impeaching the witness's character was considered irrelevant and impermissible when the conduct inquired into was not connected with the case. *Brent v. State*, 632 So. 2d 936, 943 (Miss. 1994) (citations omitted). However, as this Court stated in *Brent*, 632 So. 2d at 943, Rule 608(b) of the Mississippi Rules of Evidence provides a small "window of opportunity":

> Specific instances of conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, <u>if probative of truthfulness or untruthfulness</u>, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for the truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

M.R.E. 608(b) (emphasis added). The comment to the rule notes that this exception goes further than pre-rule Mississippi practice and allows "impeachment by specific acts which are something other than criminal convictions when the character trait of truthfulness of the witness being examined is under attack." M.R.E. 608(b).cmt. The trial judge has discretion in deciding to permit such inquiry. *Brent*, 632 So. 2d at 943.

¶48. Dr. Owen's medical reputation and his propensity for untruthfulness are highly relevant to his credibility in offering a medical opinion as to whether Kircher was involuntarily intoxicated, and thus they are highly relevant to the question of Kircher's confession and guilt. Falsifying applications for medical privileges is clearly relevant to a witness's propensity for veracity or lack thereof. The trial judge had discretion under M.R.E. 608(b) to allow the evidence, and his decision to do so was clearly not an abuse of discretion.

¶49. Kircher also argues that the documents inquired into by the State on cross were improperly obtained by the district attorney's use of a grand jury subpoena duces tecum issued to the Mississippi State Board of Medical Licensure. Kircher contends that the subpoena power of the grand jury under Miss. Code Ann. § 13-7-21 (Supp. 1999) is reserved exclusively unto the grand jury, solely for the business of the grand jury. Kircher argues that the State's use of the grand jury subpoena duces tecum to

obtain records from a governmental agency was abusive and led to the presentation of highly prejudicial evidence to the jury.

¶50. The State incorrectly asserts that no contemporaneous objection was made to the trial judge that the documents used to question Dr. Owen were obtained through grand jury procedures. The trial judge met in chambers with counsel for the State and for Kircher at which time Kircher's counsel objected to the use of the documents regarding the proceedings before the Mississippi State Board of Medical Licensure. Though this objection was not on-the-record, Kircher's counsel followed the procedure found in M.R.A.P. 10(c) to supplement the record.

¶51. Kircher submits that the trial judge's permitting the State to use documents improperly obtained sanctioned an abuse of power by the State. The standard of review, however, for evidentiary rulings by the trial court is whether the trial judge's ruling was an abuse of discretion, not whether the trial judge's decision allowed an abuse of power by the State. Furthermore, any error of the trial judge in allowing the use of the records was harmless in that the Medical Licensure documents are public documents as provided by Miss. Code Ann. § 25-61-3 (b)(Supp. 1999).

¶52. The trial judge correctly allowed cross-examination into the matters regarding Dr. Owen's falsifying applications for medical privileges. Therefore, the ruling of the trial judge is affirmed.

### III. THE TRIAL COURT ERRED IN NOT GRANTING DEFENDANT'S MOTION FOR NEW TRIAL.

¶53. In his last assignment of error, Kircher argues that the trial court erred in not granting the motion for new trial. Kircher asks this Court to vacate the jury's verdict on the grounds that the verdict was against the weight and sufficiency of the evidence.

¶54. In reviewing the decision of the trial court on a motion for a new trial, this Court views all of the evidence in the light consistent with the jury verdict, with the State receiving the benefit of all favorable inferences from the evidence that point to the guilt of the defendant. *Strong v. State*, 600 So.2d 199, 204 (Miss. 1992). A motion for new trial addresses the weight of the evidence and should be granted only to prevent an unconscionable injustice. *McClain v. State,* 625 So.2d 774, 781 (Miss. 1993). Accordingly, we will reverse and remand for a new trial only upon reaching the conclusion that the trial court has abused its discretion in failing to grant a new trial. *Thornhill v. State*, 561 So. 2d 1025, 1030 (Miss. 1989).

¶55. Kircher argues that the evidence clearly shows that he did not possess the requisite intent to commit murder and that he was not capable of voluntarily waiving his rights.

¶56. The State contends that having had the benefit of hearing the witnesses and observing their demeanor, the jury acted as rational finders of fact and returned a verdict that is supported by the overwhelming weight of the evidence. The jury heard of Kircher's admission to the stabbing of McCrary. Officers who heard the admission testified that Kircher gave a clear and detailed confession as to the events that led up to the stabbing. Additionally, the emergency room physician and nurse also testified as to Kircher's demeanor while in the emergency room, reporting that Kircher was stable, alert, and oriented at the time of his confession. The jury was free to assess and give weight to the testimonies of the officers and of the emergency room physician and nurse, as well as to the testimony of Dr. Owen. It is the function of the jury to accept the testimony of some witnesses and not others. *Gathwright v. State*, 380 So. 2d 1276, 1278 (Miss. 1980). This Court has stated in numerous cases that when the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony. *Id.* When viewed in the light most favorable to the jury verdict, the evidence presented against Kircher was more than ample to convict him of murder. The verdict is beyond the authority of this Court to disturb.

## CONCLUSION

¶57. The trial court held a suppression hearing to determine whether Kircher's confession was voluntarily made. Officer Pennington testified during the hearing that Kircher gave clear details of the events that ended in the stabbing death of McCrary, that he advised Kircher of his *Miranda* rights, and that his confession was free and voluntary. All officers involved corroborated Pennington's view that Kircher's confession was free and voluntary. Furthermore, the emergency room nurse, Marianne Rainer, testified that Kircher appeared calm and at ease, fully aware of the circumstances. She also testified that Kircher was advised of his *Miranda* rights.

¶58. The emergency room physician, Dr. Chouteau, testified that, although Kircher's blood pressure was low initially, it improved dramatically in short order, and his other vital signs were normal. He opined that Kircher was alert, oriented and not in shock. He stated that Kircher was not administered morphine sulfate in the emergency room, but rather that was subsequently done in ICU.

¶59. Kircher could remember very few details of the incident. His expert psychiarist, Dr. Owen opined that Kircher was in fact under the influence of drugs, involuntarily administered by COPAC doctors prior to this incident as well as those administered in the hospital, thus his confession was inadmissible. Even if we found error here, although we hold there is none, it would be harmless in view of the overwhelming evidence against Kircher.

¶60. The trial court, applied the correct legal standard, resolved the disputed facts

considering the totality of the circumstances, and thereafter concluded that Kircher's confession was free and voluntary, therefore admissible.

¶61. Also, the trial court was correct in allowing the State to cross-examine Dr. Owen on matters relating to his character for truthfulness or untruthfulness. Finally, the trial court did not err in denying Kircher's motion for new trial. We find no merit to any of the issues raised by Kircher. Kircher's conviction and sentence are affirmed.

¶62. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**PRATHER, C.J., PITTMAN, P.J., WALLER AND COBB, JJ., CONCUR. MILLS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH AND WALLER, JJ. BANKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J., AND McRAE, J. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J., AND BANKS, J.**

**MILLS, JUSTICE, SPECIALLY CONCURRING:**

¶63. I specially concur in the majority opinion and write to underscore an important factual finding in this case. After a careful and independent examination of the record, the majority found that the trial court properly determined that Kircher was not in shock nor was he administered any mind-altering drugs such as morphine before giving his confession to law enforcement officers. The dissent states that Kircher was under the influence of morphine at the time he made his confession. This fact is not in the record. No testimony exists establishing that morphine, a powerful painkiller, had been injected into the defendant prior to his confession. If, indeed, the record showed that Kircher had been in shock or was under the influence of morphine at the time he gave his statement to police officers, I would be inclined to vote to reverse his conviction on the ground that his confession was not knowingly and voluntarily given. However, such facts do not exist here.

**SMITH AND WALLER, JJ., JOIN THIS OPINION.**

BANKS, JUSTICE, DISSENTING:

¶64. Because I am convinced that under the totality of the circumstances reasonable doubt must be found as to whether the confession here in issue was given voluntarily, I respectfully dissent. Under no circumstances should the erroneous admission of an

involuntary confession be treated as harmless error. This is especially so where no other valid confession is also admitted. Accordingly, the majority's alternate rationale for affirmance should be rejected.

**SULLIVAN, P.J., AND McRAE, J., JOIN THIS OPINION.**

**McRAE, JUSTICE, DISSENTING:**

¶65. When someone who has been on drugs, is in a drug rehabilitation program, attempted suicide by stabbing himself several times in the chest and abdomen, is taken to the hospital, given morphine, prepped for surgery to close wounds, and is then interrogated, the majority holds any confession made at that time admissible as a knowing and intelligent waiver of one's "rights." This is pushing the envelope. If this occurs, then there are no "rights" in Mississippi which apply to confessions. Sure, someone who has been given morphine may appear relaxed and people talking to him might be inclined to say that he understood his rights and appeared to be calm and collected. That is all the more reason to believe the drug has taken effect. For someone who had just killed another man and then tried to take his own life, the early stages of shock are not ordinarily calm. The totality of the circumstances in this case establish that Kircher was in no shape to waive his rights. Accordingly, I dissent.

¶66. On August 28, 1995, while lying in an emergency room bed awaiting surgery, Neil Kircher was interrogated by law enforcement officials. At the time of his alleged voluntary waiver of rights and subsequent confession, Kircher was in pain and bleeding from self-inflicted butcher knife wounds received during a failed suicide attempt and had just been prepped for surgery.

¶67. This Court's stance on the waiver of *Miranda* warnings has long been settled; that despite how meticulous a warning is, or how many times it is repeated, it cannot be sufficient to render any inculpatory statement admissible thereafter given by the accused unless waived intelligently, knowingly and voluntarily. *Neal v. State*, 451 So.2d 743, 753 (Miss. 1984).

¶68. The State has the burden of proving beyond a reasonable doubt that any confession was given voluntarily. *Blue v. State,* 674 So.2d 1184, 1204 (Miss. 1996); *Haymer v. State*, 613 So.2d 837, 839 (Miss.1993). After a prima facie case is made by the State, the defendant may then present evidence to rebut the State's argument. *Cox v. State*, 586 So. 2d 761, 763 (Miss. 1991). The standard for determining whether a confession is voluntary is whether, taking into consideration the totality of the circumstances, the statement is the product of the accused's free and rational choice. *Porter v. State*, 616 So.2d 899, 907-08 (Miss.1993) (citing *United States v. Rogers*, 906 F.2d 189, 190 (5th Cir.1990)).

¶69. The admission of a drug-induced confession would clearly violate a defendant's right against self-incrimination 8 guaranteed by the U.S. Constitution and the Mississippi Constitution. *Wright v. State*, 730 So.2d 1106, 1108 (Miss. 1998), *Malloy v. Hogan*, 378 U.S. 1, , 84 S.Ct. 1489, 12 L.Ed. 2d 653 (1964).

¶70. Although there are no cases in Mississippi specifically discussing the admissibility of statements made under the influence of morphine, other jurisdictions have dealt with the issue. In a case similar to Kircher, a defendant was interrogated by law enforcement officers while in the hospital and while being administered morphine for pain. The court affirmed the lower court's suppression of the defendant's statements, declaring that since defendant had been receiving morphine at regular intervals that would cause an average person to experience intoxication, it was sufficient to support the finding that defendant's inculpatory statement was not voluntarily given. *People v. Fordyce*, 612 P.2d 1131 (Colo. 1980).

¶71. The court in *Fordyce* looked to the expert testimony of a toxicologist relying on the defendant's medical records. The expert discussed morphine's effects on the central nervous system and its euphoric effect which takes away a person's perception of pain. *Fordyce*, 612 P.2d at 1132-33. According to the defense's expert, although a patient may exhibit no outward signs of intoxication,[1] morphine has the potential to take away a patient's perception of danger, thereby lessening self-protective instincts. *Id.*

¶72. In addition to being given morphine, Kircher was also taking anti-depressant medication prescribed at COPAC. Dr. William Owen, who was accepted at trial as an expert in the field of forensic psychiatry, testified that drug intoxication occurs when the unintended effects of a drug manifest. According to Dr. Owen, taking the medicine given by COPAC over a period of time would cause the adverse affects to turn into mania and an inability to hold thought or resist impulses and ultimately, the condition would turn into frank psychosis with delusions and hallucinations.[2] In sum, Dr. Owen declared that Kircher lacked the capacity necessary to understand and appreciate the surrounding circumstances and could therefore give no free and voluntary waiver:

> I don't think anyone in shock - - can weigh facts and come to any logical conclusion. I don't think someone who's been given morphine intravenously can weigh facts and come to a logical conclusion. And thirdly, I don't think anyone suffering from intox- -drug intoxication can weigh facts and come to a logical conclusion.

¶73. Although the majority is correct in holding that no one factor is dispositive in the totality of circumstances test, *Johnson v. State*, 511 So.2d 1360, 1365 (Miss. 1987), the evidence in this case establishes that Kircher was suffering from **both** mental and

physical defects. Kircher was suffering mentally due to shock, the injection of morphine and other antidepressants, and having attempted suicide. The fact that Kircher had attempted suicide just prior to questioning clearly establishes his lack of sanity and ability to act rationally and calmly. He clearly did not know what he was doing. The result of this attempted suicide also caused Kircher to be in great physical pain due to the numerous self-inflicted blows with a butcher knife to his chest and abdomen. The combination of elements required under the totality of circumstances test are present in this case and warrant a reversal. *State v. Williams*, 208 So.2d 172 (Miss. 1968)(court held a voluntary waiver cannot be made when defendant evinces "an acute, rampant state of intoxication equivalent to mania" and a "deranged and psychotic mental imbalance.")

¶74. The court erred in finding **beyond a reasonable doubt** that Kircher's waiver of his *Miranda* rights were voluntarily made. There were other factors which alone may have convicted Kircher which the jury should have been allowed to consider without the prejudice of an unconstitutionally obtained confession taking center stage. Agreeing with a majority decision which allows officers to elicit a confession from someone in Kircher's physical and mental condition would amount to allowing law enforcement officials to revert back to the days of hot lights and rubber hoses. Accordingly, I dissent.

## EPILOGUE

¶75. The totality of circumstances surrounding the interrogation and subsequent confession by Kircher warrant a reversal and remand for a new trial. An individual who escapes from the control of a drug rehabilitation center, is on anti-depressant medication, kills someone and then turns the knife on himself, surely cannot be considered competent to waive any of his rights. This is especially true where, as here, the interrogation takes place while the individual is in a hospital bed bleeding from the chest and abdomen awaiting surgery.

¶76. Relevant portions of the record further support this dissent. As to the issue of whether Kircher exhibited any signs of shock, the treating physician Dr. Chouteau[3] testified at trial on January 17, 1997, to the following:

> Q: Would you say that he was exhibiting the normal sign of a patient who had lost a quart of blood?
>
> A: I think he was. Yeah. Okay.
>
> Q: Okay. So initially as soon as he was presented at the emergency room, he was exhibiting the, for the lack of a better term, **early signs of shock**?

A: **Yes.**

(Volume 3, page 214, lines 14-21).

¶77. There is also apparently some confusion in the record and by this Court as to whether Kircher was administered any morphine before being interrogated by the officers. Dr. William Owen, who inspected the medical records from Rankin General Hospital, testified to the following on October 11, 1996:

Q: All right. And you say he was given some morphine sulphate at Rankin General
A: Yes, he was, intravenously.

Q: How much was he given?

A: Off the top of my head, a small dose, 2 milligrams.

Q: Okay. How was that given to him?

A: Intravenously.

Q: **Was he given more than one dose of morphine?**

A: **Yes, multiple doses of morphine**.

Q: Do the records indicate why he was given- -

A: I'm sure.

Q: - - morphine?

A: Yes, for pain. He had some pretty severe wounds.

(Volume 2, page 147, lines 6-20).

¶78. In addition, the testimony of one of the State's witness, Dr. Chouteau, is once again helpful. Dr. Chouteau confirms that Kircher gave his confession right before surgery and not earlier in the day as some have speculated:

Q: All right. Do you recall whether or not those officers took any statements from the

defendant?

A: I know they - -they took one - - or I noticed them talking to the patient at one point after the initial resuscitation, if you would.

Q: And when during - - during that hour, when would that have been that you

observed the officers talking to him? Would that have been early in your treatment or after you were through or just when?

A: **Late, after we essentially had him ready to go to surgery**.

(Volume 3, page 205, lines 4-14).

¶79. In addition to Kircher's state of mind at the time of his waiver being clouded by morphine, he had also been on several anti-depressants while at COPAC for his third treatment for heroin, LSD and marijuana dependence. (D-01, Copy of medical records from COPAC, Volume 2, page 145). These factors, combined with the fact that Kircher had just killed someone, attempted suicide and as a result was suffering from butcher knife stab wounds, present a solid case under the totality of circumstances test to hold any waiver of rights insufficient.

¶80. For further proof of Kircher's weakened state at the time of questioning, see Appendix A which shows the great disparity between Kircher's normal signature and that given when he was admitted to the Rankin County Hospital the day of his arrest. It does not take a rocket scientist, or even a graphologist to see the great discrepancy between the two signatures. Due to his self-inflicted stab wounds, Kircher required surgery which took place without gaining a signed authorization waiver from Kircher. See Appendix B. One can only wonder whether he was physically or mentally unable to sign or was simply never asked. If the totality of the circumstances surrounding Kircher's waiver and confession does not warrant protection due to a lack of rational and free choice, to what extreme degree must such "circumstances" rise?

## SULLIVAN, P.J., AND BANKS, J., JOIN THIS OPINION.

1. An emergency room doctor, an attending nurse and four investigating officers all testified that Kircher gave clear answers to the questions asked and seemed alert and calm. These statements, consequently cited by the majority as evidence of voluntariness, actually support the fact that the morphine had caused a calming effect on Kircher by the time he was questioned.

2. Dr. Owen's testimony of possible delusions and frank psychosis is further supported by the fact that Kircher had just committed a murder and attempted suicide with a butcher knife.

3. Dr. Chouteau was the emergency room treating physician and tendered by the State as an expert witness.