962 So.2d 728 (2007)
James WHITE, Appellant
v.
STATE of Mississippi, Appellee.
No. 2006-KA-00988-COA.
Court of Appeals of Mississippi.
August 14, 2007.
*730 M.A. Bass, attorney for appellant.
Office of the Attorney General by Stephanie B. Wood, attorney for appellee.
Before LEE, P.J., IRVING and CHANDLER, JJ.
IRVING, J., for the Court.
¶ 1. James White was convicted by a jury of manslaughter and was sentenced by the Jefferson County Circuit Court to serve twenty years in the custody of the Mississippi Department of Corrections. Aggrieved, White appeals his conviction, alleging that there is insufficient evidence to support his conviction and that his conviction is against the weight of the evidence, and that the court improperly allowed the State to question him about a prior conviction and an alleged prior bad act.
¶ 2. Finding no reversible error, we affirm.

FACTS
¶ 3. On July 12, 2003, Dorothy Bell, White's sister, was having a birthday party at her home in Jefferson County. Numerous people were there, including White and Terrell Ellis, Bell and White's nephew. At some point during the day, Ellis got into a dispute with his father over whether Ellis's mother, Bertha, should stay at the party.[1] White intervened and apparently attempted to convince Ellis to stay out of the disagreement between his parents. The exchange between White and Ellis grew heated, and according to some accounts, Ellis then pushed White onto the back of a car. Regina Thomas, Ellis's girlfriend, testified that White pushed Ellis during the altercation and denied that Ellis pushed White over a car. Thomas indicated that White was significantly larger than Ellis, a fact that White also admitted on the stand. The dispute ended when Bell came over and asked those involved to leave before they ruined her party.
¶ 4. After Bell's warning, Ellis and Thomas walked some distance away, while White left and drove away from the party. Thomas testified that she worked to calm Ellis and get him to leave the party, which he eventually agreed to do. White testified that he drove some distance away from Bell's house before he decided to return and apologize to Bell and her husband for creating a disturbance at the party. He then returned to Bell's house, where he allegedly apologized to Bell and her husband. It was after his return that a second fight broke out between Ellis and White.
¶ 5. It is not clear who instigated the second conflict between Ellis and White. Thomas testified that she and Ellis were walking back to the house when White yelled at Ellis, and that Ellis then took off his shirt, presumably in preparation for an altercation with White. Bell also testified that White called out to Ellis, although she stated that Ellis's shirt was already off prior to White's shout. To the contrary, White claimed that Ellis approached him and started the altercation. What is undisputed is that the two men approached each other and began wrestling on the *731 ground. Thomas, who was close enough to observe the fight, testified that Ellis tackled White to the ground. Eventually, after what Thomas stated was a short amount of time, Ellis and White broke apart and stood up. Thomas testified that Ellis took a few steps toward her before collapsing to the ground, bleeding from a stab wound to the chest. White immediately left the scene in his car. Betty Segrest, White's sister who testified on his behalf, admitted that Ellis was not bleeding before the second altercation, and that she knew of no cuts on him prior to the fight with White.
¶ 6. After the second fight, Bell went into the house and dialed 911, but she, Thomas, and some other individuals left to take Ellis to the hospital before any emergency personnel arrived at the house. Ellis was conscious when he arrived at the hospital, but died several hours later from blood loss. Dr. Steven Hayne, a forensic pathologist, testified that his post-mortem examination revealed one fatal stab wound to Ellis's chest, and several non-fatal cuts. Dr. Hayne also testified that the fatal stab wound pierced Ellis's heart and caused him to suffer massive internal blood loss, eventually resulting in his death.
¶ 7. After questioning pointed to White as a likely suspect, he was arrested at his mother's home. An ensuing search of White's possessions uncovered no weapon that could be positively identified as the knife that killed Ellis.[2] Thomas testified that she was certain that Ellis did not have a knife in his possession, because she felt around in his pocket while she was getting the car keys from him shortly before the incident, and there was no knife in his pocket at that time. Thomas also testified that she saw White pull out something like a knife during the first altercation between Ellis and White.
¶ 8. White was charged with murdering Ellis. At trial, White testified that he did not stab Ellis, but indicated that Ellis did have a knife out during their fight. This testimony did not match White's statement to police, which was given within a few days of the fight, wherein White said nothing about Ellis having a knife. In that statement, he admitted to fighting with Ellis, although he denied stabbing Ellis. The officer who took White's statement testified that White was given ample opportunity to relate any information that he wanted to share with the officers. At trial, White denied knowing that Ellis was injured at the time that he left Bell's house. White intimated that Ellis might have been injured when he came at White with a knife and that White deflected the attack in an attempt to defend himself.
¶ 9. During cross-examination, White testified that he is a peaceful person who does not get angry with people he loves. In response to this testimony, the State requested to introduce evidence that White had previously been convicted of shooting into the occupied dwelling of his ex-girlfriend, who was also the mother of his child. In addition, the State sought to question White about an incident where the same ex-girlfriend was slashed across the face with a knife during an argument between White and another individual. After considering the probative and prejudicial value of the prior bad acts, the court allowed the State to question White about both incidents. At the close of all the evidence, the jury was instructed that it could find White guilty of either murder or the lesser-included offense of manslaughter. Thereafter, the jury found White *732 guilty of manslaughter, and the court sentenced him to twenty years imprisonment.
¶ 10. Additional facts, as necessary, will be related during our analysis and discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES
1. Sufficiency and Weight of the Evidence
¶ 11. White alleges that "[t]he trial Court erred in not granting [his] Motion for Directed Verdict at the end of the State's case and at the end of the Defendant's case because the verdict was against the overwhelming weight of the evidence and was a result of bias, prejudice and passion." White then goes on to discuss the sufficiency of the evidence supporting his conviction, although he also makes arguments contesting the weight of the evidence.
¶ 12. Motions for a judgment notwithstanding the verdict or for a directed verdict challenge the sufficiency of the evidence supporting a conviction. Duncan v. State, 939 So.2d 772, 782-83(¶ 36) (Miss. 2006). By contrast, a motion for a new trial challenges the weight of the evidence supporting a conviction. Jenkins v. State, 947 So.2d 270, 278(¶ 24) (Miss.2006). As White makes arguments regarding both the weight and the sufficiency of the evidence, and as he made a motion for both a directed verdict and for a new trial below, we address both the weight and sufficiency of the evidence.
Sufficiency
¶ 13. When reviewing the sufficiency of the evidence, we review the record in "a light most favorable to the State." Robinson v. State, 940 So.2d 235, 239-40(¶ 13) (Miss.2006) (citing McClain v. State, 625 So.2d 774, 778 (Miss.1993)). We must "accept as true all evidence consistent with [the defendant's] guilt, together with all favorable inferences that may be reasonably drawn from the evidence, and disregard the evidence favorable to the defendant." Id. at 240(¶ 13) (citing McClain, 625 So.2d at 778). If the evidence is such that "`reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense,' the evidence will be deemed to have been sufficient." Duncan, 939 So.2d at 783(¶ 36) (quoting Bush v. State, 895 So.2d 836, 843(¶ 16) (Miss.2005)).
¶ 14. White makes very few arguments regarding the actual evidence that sustains his conviction, but he does state: "Once the State has produced evidence of a crime, the suspicious death of Ellis, and then provided circumstances of a `scuffle,' then a name to the jury by some witnesses, then in today's judicial system, that's all the public needs for a conviction." We note that there was testimony from multiple witnesses, including White himself, that he was engaged in a fight with Ellis shortly before Ellis died. Multiple witnesses also testified that Ellis was bleeding heavily from a previously nonexistent stab wound after the "scuffle" with White. White also alleges that the testimony of some witnesses was "lacking in credibility and competency," but he does not identify which witnesses, or why they were allegedly incompetent or lacking in credibility. We note that Thomas and Bell, both of whom testified, were adults who actually witnessed the events in question. Nothing was produced to bring into question either their credibility or their competency.
¶ 15. We find that the evidence is sufficient to sustain White's conviction. Although White related a version of events to the jury that conflicted with the version *733 told by the State's witnesses, the jury is the ultimate judge of the credibility of witnesses. Id. at 782(¶ 35). The testimony by the State's witnesses indicated (1) that Ellis had no weapon, (2) that Ellis and White began fighting, (3) that Ellis suffered a fatal stab wound to the chest sometime during the fight, and (4) that White left the scene immediately. Thomas and Bell also indicated that it was White who approached Ellis and instigated the fight. Even White's own witness, Segrest, testified that Ellis was uninjured before the fight with White. Nothing was presented to indicate that anyone else was involved in the second fight between White and Ellis. Under these circumstances, reasonable persons clearly "might reach different conclusions" regarding each element of manslaughter.[3] Therefore, the evidence is sufficient to sustain White's conviction.
Weight
¶ 16. We will reverse a conviction as against the overwhelming weight of the evidence only when "to allow it to stand would sanction an unconscionable injustice. . . ." Jenkins, 947 So.2d at 278(¶ 24) (quoting Baker v. State, 802 So.2d 77, 81(¶ 14) (Miss.2001)). We will "accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial." Id. (quoting Baker, 802 So.2d at 81(¶ 14)).
¶ 17. Accepting as true all the evidence that supports White's conviction, allowing his conviction to stand does not "sanction an unconscionable injustice." As discussed above, the evidence was clear that Ellis was uninjured prior to his encounter with White, and that after the encounter, he was bleeding to death from a stab wound to the chest. The only evidence to indicate that Ellis possessed a knife was White's testimony, while Thomas testified that Ellis did not have a knife. The jury was entitled to believe whomever it found more credible, and the court did not err in refusing to grant White a new trial.
¶ 18. This contention of error is without merit.
2. Admission of Prior Bad Acts
¶ 19. In this allegation of error, White complains of the admission of two prior bad acts, one of which resulted in a conviction.
¶ 20. In order to present a full picture of the admission, we quote at length some relevant portions of White's testimony during cross-examination:
A. I thought they were going by what the people say. I didn't know Terrell was hurt or nothing, I cut him or nothing like that. I ain't  I didn't have nothing against Terrell. That [sic] was just like a child to me.
Q. Like a child to you?
A. Yeah, he hurt me before, you're saying all that about the baby.
Q. About the baby?
A. That's what I called all my nephews and nieces and things. I love my folks. I didn't have nothing against my folks.
Q. Well, I understand that you loved your folks, Mr. White.
A. I didn't have nothing against Terrell.

*734 Q. But sometimes people  things happen and you get mad, don't you?
A. Nothing make me mad to do nothing to Terrell.
Q. Nothing could make you mad to do that to Terrell?
A. Couldn't nothing make me mad enough to do nothing to Terrell.
Q. Let's talk about your temper. Sometimes people can do things to you to make you mad, right?
A. People, but not my folks.
* * * *
Q. But that made you mad, too?
A. I didn't get mad. I didn't get mad. I don't get mad.
Q. You don't get mad?
A. No.
Q. You never get mad at everybody [sic], get mad?
A. I get unpleased, I don't get mad.
Q. Everybody gets mad.
A. Well, not me.
Q. You ain't never got mad?
A. Well, maybe in my young days, maybe got mad about something, I don't know. As far as something with my nephew, I didn't get mad. I'm supposed to be a leader for them.
* * * *
Q. What about other people you love? Do you get mad at other people? You say you couldn't get mad at your nephew, but other people you care about?
A. Well, I don't too much deal with people.
Q. All right.
A. I go to church, I be in the Mississippi [sic] church. I go to church.
* * * *
Q. And so you go to church?
A. Yes, sir.
Q. But even people that go to church can lose their temper and do things that they regret, can't they?
A. That's what they did for Jesus and he did for all of us.
Q. And you lost your temper and done things that you regret, don't you?
A. I didn't lose my temper and did nothing.
It was shortly after this testimony that the State asked the court to allow it to question White regarding the prior bad acts.
¶ 21. Rule 609 of the Mississippi Rules of Evidence dictates when a prior conviction may be used to impeach a witness. A conviction is allowed so long as "the crime was punishable by death or imprisonment in excess of one year. . . ." M.R.E. 609(a)(1)(A). The prior conviction of a party is admissible so long as its probative value "outweighs its prejudicial effect to the party." M.R.E. 609(a)(1)(B). The rule states that a conviction is not admissible if it occurred more than ten years ago.
¶ 22. White's conviction was in 2002, within ten years of the incident in this case. White's prior crime, shooting into an occupied dwelling, carried a maximum penalty of up to ten years imprisonment. Miss.Code Ann. § 97-37-29 (Rev. 2006). Therefore, the only question that remains regarding the admission of the conviction is whether its probative value outweighed any prejudicial effect. The following factors are to be addressed by the court when determining whether a prior conviction's probative value outweighs its prejudicial effect:
(1) The impeachment value of the prior crime.

*735 (2) The point in time of the conviction and the witness'[s] subsequent history.
(3) The similarity between the past crime and the charged crime.
(4) The importance of the defendant's testimony.
(5) The centrality of the credibility issue.
Bush, 895 So.2d at 847-48(¶ 29) (quoting Peterson v. State, 518 So.2d 632, 637 (Miss. 1987)).
¶ 23. In this case, the court looked at the above factors and determined that the prior conviction's probative value outweighed its prejudicial effect:
I think that the jury is capable of evaluating his testimony, but it seems like the defendant has not told the full story here under the Peterson case. That's why I asked you that awhile ago. I think under the Peterson case, one of the things that weighs heavily against introduction of the testimony if it is something that is very similar in nature and things of that nature, and I'm considering that at this point.
The testimony the [S]tate seeks to elicit at this point seems to the court is very highly probative, is extremely probative on an issue that the State has not placed in issue. It's an issue that the defendant has placed in issue. And I consider the testimony the State seeks to elicit to be extremely probative. In fact, and I don't know of any other evidence the State could introduce that would address that issue. And it appears to me that since the defendant has opened the door for this type of testimony, while I understand, the court understands that testimony the [S]tate seeks to elicit is similar in nature and under the Peterson [sic] would weigh against his testimony.
I think if you'll examine the court's ruling, this court generally holds in this instance against the admission of the testimony. In fact, I don't believe I've ever allowed the State to introduce testimony this similar in any type of criminal trial. However, in this instance, I see this as being so probative, and the only evidence that could address that issue, I think I'll allow it. I find it to be more probative than prejudicial, and I'll allow the testimony.
Prior to this ruling from the bench, the court had discussed the fact that White obtained the prior conviction in 2002. After hearing White's testimony outside the presence of the jury about what happened with the prior incident where his girlfriend's face was slashed, the court stated:
Well, again, it appears to the court that Mr. White is  first of all, has not been forthcoming with his testimony as he sits here and testifies outside the presence of the jury, and that's obvious to the court. Again, the State did not seek to introduce the testimony that's been introduced into the trial relating to past conduct and temperament of Mr. White. Mr. White has introduced that. And again, I feel that normally in a situation, I would totally disallow his [sic] testimony.
But I believe in light of the nature of Mr. White's testimony and in light of the nature of his lack of straight forwardness in his testimony outside the presence of the jury, in light of the highly probative nature of the testimony, not so much the acts themselves that were or were not committed by the defendant, but the fact that they are so contrary to the nature of the defendant that he has described to the jury for himself, I believe that these things are highly probative.
And again, while they are similar in nature to the act charged in this case, I feel they're so probative that they out-weigh *736 any prejudicial effect. And when looking at the Peterson requirements and the nature of the testimony and the setting that's offered in, I feel that that may be the only testimony  the only way the [S]tate could  only testimony the [S]tate could introduce to combat this testimony. And I feel it's so highly probative that I'm going to allow it, even in light of the prejudicial effect of the testimony. And I have duly considered and weighed that testimony, and I find it to be much more highly probative than prejudicial, and I'll allow it.
Clearly, the court attempted to take into account all the requisite factors and make a ruling in accordance therewith.
¶ 24. When an appellant challenges the admission of evidence such as a prior conviction, we review the trial court's decision under an abuse of discretion standard. Tate v. State, 912 So.2d 919, 924(¶ 9) (Miss.2005). Even when there is error, we "will not reverse unless the error adversely affects a substantial right of a party." Id. (quoting Ladnier v. State, 878 So.2d 926, 933(¶ 27) (Miss.2004)). White argues that "[t]he State's position, supported by the Trial Judge [sic], is that Mr. White committed a violent crime, ergo, he's not credible, ergo, we use the exception in Rule 609." A review of the record reveals that the trial court's decision was based on substantially more than a decision that anyone who commits a violent crime is not credible.
¶ 25. White testified that he does not get angry with his loved ones, and that he, at best, simply walks away if he starts to get angry. Standing in stark opposition to this testimony was White's prior conviction for shooting into the house of his ex-girlfriend, whom he testified that he loved, after she made him angry. Clearly, White made himself out to have qualities that his prior conviction indicated that he does not have. As such, White opened the door to the State's questions about his prior conviction. Although the crimes were similar in that they both involved White's attack on a loved one, we cannot say that the court erred in not finding that the prejudice outweighed the probative value. Given the facts of this case, where White's story stood in stark opposition to the story told by the State's witnesses, and where White so clearly placed his character into evidence, we cannot find that the court abused its discretion in allowing the admission of White's prior conviction.
¶ 26. We are more troubled by the court's decision to allow the State to question White regarding the prior incident that did not result in a conviction, where his ex-girlfriend's face was cut during an altercation. The State appeared to have no proof of any conviction in the matter, and the record is unclear as to whether White was ever charged with any crime for the incident. However, during questioning outside the presence of the jury, White admitted that he was arrested as a result of the incident, although he steadfastly maintained that he had not actually done anything wrong. Because White was arrested as a result of the incident, we find that the court did not err in allowing the State to question White about the incident, as the arrest indicates that the incident was in fact a "bad act."
¶ 27. Furthermore, when White was questioned about the incident in front of the jury, he steadfastly maintained that he had done nothing wrong, and nothing was presented to contradict his averments. Therefore, we find that any error that flowed from the State's questioning was harmless at best. Additionally, in light of the overwhelming weight of the evidence against White, any error committed by the court in allowing the questioning is harmless. *737 See Kircher v. State, 753 So.2d 1017, 1027(¶ 43) (Miss.1999).
¶ 28. White also complains that the court did not sua sponte instruct the jury to limit its consideration of the State's questions about his prior bad acts. In general, once a defendant has objected to the introduction of such evidence, the court should issue such an instruction whether it is requested or not, unless the defendant objects to the instruction. Robinson v. State, 735 So.2d 208, 210(¶ 4) (Miss.1999). However, even when the court neglects to issue a limiting instruction, such an omission is harmless in a situation such as this, where the evidence supporting a conviction is overwhelming. Givens v. State, 730 So.2d 81, 90-91 (¶¶ 32-33) (Miss.Ct.App. 1998). Since, as we have already found, the evidence supporting White's conviction is overwhelming, any error on the part of the trial court in failing to give an instruction is harmless.
¶ 29. THE JUDGMENT OF THE CIRCUIT COURT OF JEFFERSON COUNTY OF CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JEFFERSON COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] Bertha is Bell and White's sister.
[2] A knife was found in the glove compartment of White's car. Dr. Hayne testified that the knife could have caused Ellis's wounds, but a laboratory analysis of the knife did not reveal any blood that could positively identify the knife as the weapon that killed Ellis.
[3] Mississippi Code Annotated section 97-3-35 (Rev.2006) defines manslaughter as "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense. . . ."